[Crim. No. 4135. In Bank.—February 27, 1939.]

THE PEOPLE, Respondent, v. HARRY A. FRENCH, Appellant.

S. Luke Howe, C. S. Baldwin, F. Walter French and O. F. Meldon for Appellant.

U. S. Webb, Attorney-General, William F. Cleary, Deputy Attorney-General, A. K. Wylie, District Attorney, and Herbert P. Welch, Assistant District Attorney, for Respondent.

SEAWELL, J.—The defendant was accused by an information filed against him in the Superior Court of the County of Modoc, this state, by the district attorney of said county, with having, on March 25, 1937, in said county, killed one Claude L. McCracken, a human being, with malice aforethought. The legal sufficiency of the information charging murder is not questioned. Upon arraignment he entered two pleas, not guilty, and not guilty by reason of insanity. The jury returned a verdict of guilty as charged in the information with respect to the plea of not guilty, which carried with it the imposition of the death penalty; as to the plea of not guilty by reason of insanity, the jury found the defendant to be sane at the time he committed the homicide. Judgment upon the verdict was pronounced imposing the death penalty and defendant has appealed from said judgment and from the orders denying his motion for a new trial.

There is no question as to the commission of the homicide by the defendant. The evidence shows without contradiction that the defendant drove in his automobile to the McCracken residence at about 7 o'clock in the evening of March 25,

1937, parked his automobile, walked to the front door and entered without giving an alarm of his approach, and passed through the front room into the kitchen, holding in his hand an automatic revolver of the target practice model, where Claude L. McCracken and two ladies, Donna Conwell, a business associate, and Evelyn Olen, a young lady employed in the McCracken household, were seated about a small round dining table listening to a radio program after having finished their evening meal. No word was spoken or vocal expression was made by the defendant at any time except possibly a short inarticulate sound resembling "hi", which Donna Conwell, one of the women seated at the table, thought he uttered in response to her salutation to him as he crossed the threshold into the kitchen. He immediately opened fire at the deceased who was seated but a few feet from him. Neither of the women was certain as to the exact number of shots he fired. One or more were fired over and near the head of Donna Conwell. Mr. McCracken, in the course of the firing, arose from his chair and made his way to the kitchen sink, where he rapidly weakened from the effects of the bullets which had entered his body. He was soon taken to a hospital attended by surgeons. An operation was performed in an attempt to save his life, but he expired approximately three and one-half hours after receiving said bullet wounds from shock caused thereby. His body disclosed five distinct bullet wounds, one of which apparently passed through his arm before entering the body. The four body wounds were in the regions of the lungs, heart and liver. The intestines were severed in several places by the course of the bullets, which, in one or two cases, passed entirely through the body. The firing was done with unerring aim. No question is made that the bullet wounds were not the proximate cause of death. Two young men from adjoining premises saw the defendant park his car and enter the McCracken home.

The defendant left the scene of the tragedy much as he went upon it, without speaking to anyone, and drove to the residence of Charley Chapman, knocked at the door, and as it was opened he pushed the gun toward him and said, "Shoot me, I have shot McCracken." He made inquiry for "Aunty" Hazelton who had some years before occupied the premises. Mr. Chapman, who had known the defendant

since his boyhood, invited him in the house. The defendant told him he had shot McCracken and after talking a while he began to cry. Chapman said to him that he would have to call the sheriff and the defendant said: "All right, call the sheriff." This was done. Chapman further testified that he asked the defendant why he had come to his house and he said: "I used to come here when a boy, because Mrs. Hazelton lived there." The witness said he "argued" with him because he was doubtful as to whether he had shot McCracken, but the defendant removed his doubt by saying: "I shot him all right." Chapman then said to him, "Why did you shoot him, Harry?" He replied, "That son of a bitch insulted my folks." Deputy Sheriff George Kelley arrived presently and the defendant in answer to questions again assured them that he had shot McCracken. The defendant was properly dressed and was wearing an overcoat but he was "all over mud, he had fallen down". It had been raining, the witness added. Continuing, he said the defendant was "perspiring and his eyes were wild". He described his speech as being "a little thick, but he talked all right".

George M. Kelley, a deputy sheriff, in answer to a call, arrived at the Chapman home a short time after the sheriff's office · was notified by Mr. Chapman of the shooting. He found the defendant seated in a chair. He had seen the defendant twice before on the day of the homicide, once at 10 o'clock in the morning at a barber shop and once in the afternoon in a building he was unable to recall. Mr. Kelley said he was too excited to remember all that was said but he recalled the defendant said he had shot McCracken at the latter's home. He said his car was in the neighborhood. Deputy Sheriff George Kelley then asked him how the gun might be unloaded and the defendant said he didn't know anything about it. Mr. Kelley asked him how he was able to shoot if he didn't know how to unload it and the defendant replied that he "pulled the trigger". He thought he had shot McCracken three times. Asked why he had shot the deceased he said: "I am sorry, George." On the way from Chapman's house to the sheriff's office the defendant said: "There is some things people can't stand, George. I just stood more than I could stand." In this connection he said something about his mother and baby. Kelley called

up the hospital with the consent of the defendant and inquired the extent of McCracken's injuries and notified the defendant's family. The defendant was given a bed in the jail and slept well until he was awakened about 6 o'clock the following morning. Sheriff John C. Sharp testified to finding a broken box of long rifle cartridges, low speed, in the defendant's overcoat pocket, one loaded shell in the barrel and two or three in the magazine of the pistol. Five empty shells were found in the room where the shooting was done.

At the time of said homicide, the defendant was twenty-seven years of age. He was married in 1931, and a son was born as the issue of his marriage, January 5, 1935. The defendant, his wife and child had, for a period, resided across the street from the deceased during the continuance of their acrimonious business and newspaper rivalry. He had resided with his parents at Alturas, Modoc County, from infancy to the time of his marriage. He had attended the grammar and high schools of Alturas. A special course in business at Oakland, California, seems to have concluded his scholastic training.

R. A. French, and Mrs. Gertrude P. French, parents of the defendant, were, and had been since 1910, publishers and proprietors of the Alturas Plaindealer, a newspaper printed and circulated in Modoc County. R. A. French was the business manager, and his wife, Gertrude French, was the editor of said newspaper. During and since his school days, the defendant was continuously associated with his parents in the publication of said journal. He had worked in every department of the Plaindealer, including the mechanical, news and business departments. At one time he was the advertising manager. In 1933 the defendant was appointed a minute clerk of the state senate and he and his wife spent several months at Sacramento. Thereafter he resumed his connection with the Plaindealer. On September 1, 1933, he was appointed by the state board of equalization a sales tax collector, auditor and enforcement officer in the tax sales division which included Modoc and a portion of Lassen County. He was holding this position at the time he committed the homicide of which he stands convicted. At all times he has maintained general headquarters at the Plaindealer office. Being a long established journal, the Plaindealer doubtless had more or less prestige in the

business and political affairs of the county of Modoc. It would seem that it exclusively occupied the field of journalism until the Modoc County Times, some years later, made its appearance as a competitor.

In 1934, and prior thereto, Mr. McCracken was in the employ of the Modoc County Times. The Plaindealer, in December, 1934, absorbed the Modoc County Times, which was then published and owned by C. D. Fitzpatrick and edited by Mr. McCracken, and annexed to the name "Alturas Plaindealer", the name "Modoc County Times". Adopting the practice of counsel, we will continue to refer to said newspaper merely as "Plaindealer".

Mr. McCracken then being without employment, began the publication of the Modoc Mail, which was first printed at Lakeview, Oregon, situated a short distance across the state line, and circulated in Modoc County. Publication of the Modoc Mail was suspended in April, 1935, and resumed by Mr. McCracken in August, 1936, at Alturas, Modoc County, under its former name. In December of that year Donna Conwell, referred to herein as seated at the dining table in company with Evelyn Olen and McCracken at the time defendant fired said shots, purchased a partnership interest in the Modoc Mail and her name was announced in the Mail as one of its owners and publishers. The paper was published bi-weekly and in form contained eight pages, 13x8½ inches in dimension, and was a mimeographic print. It purportedly printed the local and general news and carried display advertisements in the form and fashion, but lacking the mechanical clearness and attractiveness, which characterizes the products of the modern printing press. Mr. McCracken and Donna Conwell were associated in the publication of the Modoc Mail to the time of the former's death.

It is one of the contentions of counsel that the defendant at the time he committed the homicide was in a "muddled and deranged condition of mind and the emotions controlled his actions, and that he acted self-conscious only of a moral justification of his act". The obvious fallacy of the proposition is that it would not have constituted a defense to a charge of murder under the law of this state even if the suggested psychological phenomena had in fact existed.. It was necessary to go further. The burden was upon the defendant to prove by a preponderance of the evi-

dence that he was insane in the sense that he was unable to appreciate the nature and the quality of his act and did not know it was wrong to commit it. No such contention is tenable under the evidence. It is conclusively refuted by the defendant's own acknowledgment made to his neighbor but a few minutes after he had shot McCracken that he had killed him and he handed the neighbor the gun used by him and requested the neighbor to shoot him. In so doing he was either moved by the *consciousness* that he had committed an act which his conscience *did not justify* or else he was conscious that he had committed a *wrongful and forbidden act* which was punishable by law. No alternative is possible.

Moreover, it has long been the settled law of this state that neither emotional, moral nor partial insanity nor insane delusion nor hallucination, nor the irresistible impulse theory (the accused being conscious as to the nature and quality of his act and that it was wrongful and punishable by law), affords grounds in this state as the basis of a defense or as an excuse for the commission of a homicide. (*People* v. *Nihell,* 144 Cal. 200 [77 Pac. 916]; *People* v. *Kerrigan,* 73 Cal. 222 [14 Pac. 849]; *People* v. *Hurtado,* 63 Cal. 288; *People* v. *Worthington,* 105 Cal. 166 [38 Pac. 689]; *People* v. *Harris,* 169 Cal. 53 [145 Pac. 520]; *People* v. *Ward,* 105 Cal. 335 [38 Pac. 945]; *People* v. *Trebilcox,* 149 Cal. 307 [86 Pac. 684]; *People* v. *Ebanks,* 117 Cal. 652 [49 Pac. 1049, 40 L. R. A. 269]; *People* v. *Willard,* 150 Cal. 543 [89 Pac. 124]; *People* v. *Troche,* 206 Cal. 35, 46 [273 Pac. 767].)

Appellant's basic defense to the act of killing, and particularly the contention that the case was not one in which the extreme penalty of the law should be imposed, is stated in condensed form in the following paragraph of his brief:

"It was, as claimed by the defense, the long continued and persistent system of libelous insult and personal abuse of the defendant's family, as well as of himself, which produced and brought about such a mental condition of the defendant, that he was incapable of the cool deliberation and intent essential to constitute murder in the first degree, or any degree. Certainly not that cool, deliberate premeditation and complete consciousness of the wrongfulness of his act essential to justify a jury in rendering a verdict of murder of the first degree without fixing a penalty of life imprisonment."

█ In addition to this major contention in the case, numerous assignments of error are urged as grounds for reversal, most of them arising on questions of law as to the admissibility of evidence offered on trial of the general issue, not guilty. These many assignments relate to offers of newspaper articles printed either in the Times or Mail (referred to in abbreviated form) which date back to 1934 and intermittently appeared to the day before the homicide. It cannot be claimed that any of the articles published during the entire period of controversy contained any threats to do bodily harm to the defendant, or indicated that the deceased was a dangerous man, or had in any way placed the life or limb of the defendant in jeopardy, nor were they in any sense a part of the *res gestae*. The only grounds upon which said articles could have been admissible at all on the plea of not guilty would have been on the theory that they contained threats to do the defendant or some member of his family bodily harm and that he acted in real or apparent necessary self-defense in taking the life of the deceased. No claim is made that he so acted and there is not the slightest evidence to support such a claim. █ The defendant offered no evidence which would tend to justify or excuse the homicide as provided by any of the subdivisions of sections 195, 196, 197, 198, Penal Code, or by any other rule applicable to the law of homicide. The defendant was wholly without the presence of the deceased at the time he formed the intent to kill and at all times thereafter until he sought the deceased out at the latter's home some considerable time after he had formed the intent and purpose to kill his victim. He executed said purpose without any act or word done or spoken on the part of the deceased. The court would have been entirely within the law if it had excluded all consideration of a verdict of manslaughter by the jury on the admitted facts of the case. There was no pretense that the act was committed upon "a sudden quarrel or heat of passion" within the letter and meaning of section 192, Penal Code. The claim of the defense, which was the only one available to the accused, was, and is, that the killing was the result of an *old* feud which finally carried him to the point where he was rendered insane as that term is defined by the law. Malice is indisputably shown by the evidence offered by the defense. The defendant did not take the

witness stand on the trial of the general issue, not guilty, but he did testify at the trial on the issue of not guilty by reason of insanity. His testimony was devoted somewhat to describing the feelings which were aroused in him by the published articles which reflected on the members of the French family, and more particularly upon his mother, the editor of the Plaindealer, who he claimed was made the central figure of said newspaper thrusts and castigations. His testimony does not indicate the slightest mental defect but on the contrary it discloses a well coordinated and sound mind. He was positive and accurate in statement and displayed an exceptionally good memory. His powers of expression betray no mental infirmity whatever. In fact, he made no pretense that he was without understanding during his preparation for and commission of the homicide. He offered nothing by way of legal extenuation or justification of his act. That he was angered by said articles and entertained a feeling of long standing hostility toward the deceased was admitted. In his testimony he made no reference whatever to the act of killing. In the main he confined himself to a recital of unfair competitive methods practiced by the deceased and what he denounced as indecent and libelous publications in which his family and his father's family were defamed, humiliated and insulted. He expressed extreme dislike and contempt for the deceased and said he had been tempted on several occasions to go to his place of business and assault him with a club, but his mother dissuaded him from executing his purpose. His mother also testified that she had restrained him from committing threatened acts of violence upon the person of the deceased on several occasions.

A number of said articles denominated as ''provocative'' of the homicide by counsel for the defendant, were admitted at the trial of the main issue and practically the contents of all of them in one form or another where materiality was discernible, were called to the attention of the jury on the trial of the issue of insanity. The court, in every instance but one, during the trial of the first issue, instructed the jury that said newspaper articles were not received as supplying grounds upon which the jury might wholly relieve the defendant of the consequences of his homicidal act, but said articles were submitted for their

consideration as an aid in determining whether in the circumstances of the homicide he should, in their judgment, be relieved of the extreme penalty of the law; in other words, the jury was frequently told that it might consider them as affording mitigating circumstances. In the single exception the court included murder of the *second* degree. Some of the articles of which complaint is made, were rejected on the grounds of remoteness; or lack of certainty as to identity of person; or lack of proof of authorship or on the ground that they were so obscure and vague as to render them unintelligible and thereby immaterial. Appellant assigns those rulings as constituting reversible error. The articles in the main were received in evidence for the limited purpose of reducing the penalty from death to life imprisonment on the first issue, but its purpose was not so limited as to the issue of insanity.

Counsel for the defendant insisted throughout the trial and insist on this appeal that all of said articles were admissible on the main issue as being highly provocative and aggravative in nature, inasmuch as they had created in the defendant an undefinable mental disturbance which swept him on as by irresistible impulse to avenge wrongs which in his mental state appeared to him to be immedicable to relief save only by the slaying of the author.

On the first or main issue the defense offered no substantial evidence which tended to justify the homicide as prescribed by the subdivisions of sections 195, 196, 197, 198, Penal Code, or by any other rule of law. Notwithstanding the admitted fact that the homicide was committed in the manner herein set forth and therefore as a matter of law precluded any claim, and none is made, that the defendant acted in self-defense, the court nevertheless gave in full the definition of manslaughter, as well as the two degrees of murder, and instructed the jury that it was within their discretion to return a verdict of manslaughter, and repeatedly during the trial of the issue of not guilty gave instructions at the request of the defense which were more favorable to him than he was entitled to have given, and went further and instructed the jury that if it had a *reasonable doubt* as to whether the defendant possessed sufficient mental power or ability to premeditate and deliberate upon the act charged, its verdict should be not guilty of murder in any degree.

■ This in effect was to instruct the jury that if it entertained a reasonable doubt as to the mental responsibility of the defendant it should acquit him, contrary to the rule consistently stated from the earliest decisions of this court to the latest which declares it to be settled law that the burden is upon the accused urging the special issue of insanity or mental incapacity, to overcome the presumption of sanity by a preponderance of the evidence. Said instruction is also in conflict with the express provision of section 1026, Penal Code, as adopted in 1927 and amended by the statute of 1935, which provides that in cases where the defendant in addition to a plea of not guilty also pleads not guilty by reason of insanity as here, the accused on trial of the general issue shall be conclusively presumed to have been sane at the time he committed the homicide. Said instruction was therefore more favorable to the defendant than the law justifies. Clearly the instruction deals with a question of mental capacity to commit a homicide and is governed by the rule which is applicable to insanity as a defense.

The defendant further testified, that he had been thrown into fits of anger by his mother informing him of receiving telephone calls from the deceased and by letters she had received from deceased which were shown to him or their contents related to him and which caused her great mental grief. The most denunciatory and malicious of said letters which it was claimed deceased had written to Mrs. French were not produced but were said to have been destroyed. Said destroyed letters were claimed to have been exceptionally libelous and indecent, one of which in particular assailed the chastity of one of Mrs. French's daughters. This letter was not called to the attention of the federal or state authorities. The reason for not doing so, the defendant testified, was that other libelous matter had been called to the attention of the U. S. Postal Department and he had been advised that the letter did not contain any threats to commit an offense and therefore no criminal charge could be lodged against the author. All of said lost or destroyed letters, the defendant testified, were intended to injure and insult members of the French family, and in particular Mrs. French, as editor of the Plaindealer, and R. A. French, her husband and business manager. One of the newspaper articles which the defendant named as having caused him the

greatest grief appeared under the heading, "Rambling Around", and stated that the local representative of the state board of equalization had been "fired" for incompetency. Defendant said he was the only representative of that body in Modoc County and he went to the deceased's office to see him about the article. Mr. McCracken replied that his name did not appear in the article. Defendant said that he made it plain to him that he was the person the deceased had in mind. McCracken said he could not prove it and defendant became quite angry and talked to him "pretty straight". Defendant said that McCracken seemed to treat the matter in a jocular fashion and said that he had written other articles in cryptic fashion for fun and that the names of the parties involved were not given and that it could not be proven that he meant any particular one of a group of individuals. The defendant stressed several circumstances as being especially annoying to him and which caused him to be angered to the extent that he had made up his mind several times to go to his office with a club and use it on him, but in each instance he yielded to his mother's advice. This state of mind usually occurred after the mother had related to the defendant some grievous insult which she claimed was communicated to her by telephone or through the mail by the deceased. One of the circumstances which provoked the defendant to considerable anger was the tendency on the part of the deceased to boost the Times and decry the Plaindealer by claiming that the Plaindealer did not publish all of the news and that the Times had the larger circulation. Upon one occasion during the publication of the Times the deceased pasted the first pages of the Times and Plaindealer side by side in his office window and made notations in ink calling attention to certain items of news which appeared in the Times but which did not appear in the Plaindealer. Defendant contends these articles were provocative and had a tendency to greatly irritate him.

The testimony of the defendant considered by itself, or in connection with the evidence as a whole, makes it very plain that the controversies which had been waged by the opposing parties had developed into a settled feud and that growing feelings of enmity and ill-will reached their climax on March 25, 1937, as the defendant observed on the cigar

counter of the "Tavern" a few copies of the Mail containing paragraphs which the defendant testified he believed were by way of innuendo intended as reflections on his family name. Defendant's counsel contend that the act of the defendant was the result of a long course of provocative conduct and acts amounting to persecution on the part of the deceased which so wrought upon the mind of the defendant as to overcome his powers of self-restraint and overthrow reason to the degree that he was not legally responsible for a condition brought about by the wrongful acts of the deceased. On the other hand, it is claimed by the people that the homicide was committed in a merciless manner and was the result of deliberation and premeditation and was founded in malice engendered by reason of the deceased having entered in competition with the French family in the newspaper business in a field formerly exclusively occupied by said family. Many of the newspaper articles about which complaint is made and which were introduced in evidence by the defense were written in caustic veins in the heat of a newspaper war in which business supremacy and political domination seemed to have been the coveted fruits of competitive extermination. Many of them clearly indicate they were retaliatory in character. However far one side, as against the other, may have transgressed the rules of fair or legitimate business methods or ethics, we do not assume to judge. It is quite probable that neither was without fault.

It appears to be in order at this point to consider whether the acts of the deceased which are claimed to have been the cause of defendant's alleged insanity were admissible on the trial of the issue of not guilty on the theory that knowledge of said acts tending to establish insanity would materially assist the jury in the exercise of its discretion as to which of the two punishments prescribed by section 190, Penal Code, should be imposed. This court in *People* v. *Troche, supra,* adopted the following statement of the law as set forth in 14 R. C. L., page 599: "It is the general rule that insanity, when interposed as a defense in a criminal prosecution, is either a complete defense or none at all, and it has been held that there is no degree of insanity sufficient to acquit of murder but not of manslaughter."

Continuing the discussion in the Troche case, we added (p. 47):

"It follows, therefore, that any evidence tending to establish the insanity of the defendant under his plea of not guilty by reason of insanity at the time of the commission of the homicide, other than evidence of the immediate circumstances of the offense, would have been irrelevant and immaterial on the trial of the general issue as to the guilt or innocence of the defendant raised by the general plea of not guilty. As the statute accorded the defendant his full right, and ample opportunity to submit to a jury his plea of insanity at the time of the commission of the offense, in excuse of his act and as a reason why no penalty of the law should be visited upon him, it follows that the trial court correctly excluded the evidence on the trial of the general issue.

"Furthermore, the only evidence admissible for the purpose of enabling the jury to determine whether the death penalty or life imprisonment should be imposed in the event the defendant should be found guilty of murder in the first degree was the evidence which the court did admit, and which concerned 'the circumstances connected with the offense'. (*People* v. *Golsh,* 63 Cal. App. 609, 613 et seq. [219 Pac. 456]; see, also, *People* v. *Witt,* 170 Cal. 104, 110 [148 Pac. 928].) The insanity of a defendant cannot be used for the purpose of reducing his crime from murder in the first degree to murder in the second degree. If responsible at all in this respect, he is responsible in the same degree as a sane man, and if he is not responsible at all he is entitled to an acquittal in both degrees. (*State* v. *Maioni,* 78 N. J. L. 339 [74 Atl. 526, 20 Ann. Cas. 204].)"

For other cases on the point we cite the following: *People* v. *Leong Fook,* 206 Cal. 64–71 [273 Pac. 779]; *People* v. *Perry,* 195 Cal. 623 [234 Pac. 890]; *People* v. *Hurtado,* 63 Cal. 288. In this state, so far as "accountability to the law is concerned there is no middle ground." (*People* v. *Perry, supra*: *People* v. *Troche, supra,* and cases therein cited.)

█ Partial insanity is not sufficient alone to excuse the commission of a homicide. "In order that 'insanity may be available as a defense to a crime charged, it must appear, that the defendant, when the act was committed was so deranged and diseased mentally that he was not conscious of the wrongful nature of the act committed'." (*People* v. *Troche, supra.*) Every act of the defendant both before, at the time

and immediately after he committed the act shows that he was conscious of the act he prepared himself to commit and which he did commit by a surprise attack. By no process of reasoning can the conclusion be reached that he was unconscious as to his act and its wrongfulness. "If he [the accused] has reasoning capacity sufficient to distinguish between right and wrong, as to the particular act he is doing, knowledge and consciousness that what he is doing is wrong and criminal and will subject him to punishment, he must be held responsible for his conduct." (*People* v. *Troche, supra.*) This rule has been so frequently stated and restated by the decisions of this court substantially in the language of the above quotations taken from the Troche case as to make it unnecessary to further revert to the subject, except, possibly, to emphasize the fact that the accused in the Willard case shot and killed the sheriff a few moments after the court had signed the commitment adjudging him insane. Willard had twice before been committed to a state institution for the insane. The jury found him guilty of first degree murder without recommendation and this court affirmed the judgment. (*People* v. *Willard*, 150 Cal. 543 [89 Pac. 124].)

Another kindred question pressed by appellant is that the verdict of the jury should not have been higher than murder of the first degree fixing the punishment (in the exercise of the jury's discretion) at confinement in the state prison for life. The argument advanced in support of the contention that mental deficiency or certain types of mental deficiencies or disorders which the law does not recognize as an excuse for a criminal act, although not legally sufficient to exempt the accused from punishment, may, nevertheless, be considered by the jury as a circumstance warranting mitigation of the punishment which the law would reflect if no mental infirmities existed, finds no favor in the law of this and other jurisdictions. It was the theory of defendant at the trial, and is here, that it was proper to admit evidence which bore upon the feeling of mutual contempt, dislike and ill-will which the respective newspaper rivals held for each other as expressed in their respective publications, and shown in other ways. This evidence, appellant claims, was properly admissible for the jury's consideration on the issue of not guilty. Rather, it may be suggested that this evidence tended to show *motive* on the part of the defendant. (*People* v. *Hurtado, supra.*)

█ The advantage, no doubt hoped to be gained by the defendant by the admission of the questioned evidence was that the jury, on the general issue of not guilty would have before it evidence which could not have been brought to its notice in any other way. Insanity cannot be invoked as a defense or justification of taking human life. It is a plea in excuse of crime. ''The plea of insanity is, and of necessity must be, a plea of confession and avoidance.'' (*People* v. *Troche, supra; People* v. *Leong Fook, supra; State* v. *Lawrence,* 57 Me. 574.)

█ Section 1026, Penal Code, provides in specific language that when the defendant pleads not guilty by reason of insanity and not guilty of the offense charged he shall be tried as if he had entered the latter plea only and ''in such trial he shall be *conclusively* presumed to have been *sane* at the time the offense is alleged to have been committed.'' (Italics ours.) If he is conclusively presumed to be sane how can the causes which it is claimed produced insanity be relevant or material to a defense that is foreclosed against him on the trial of the issue of not guilty? That issue is tried on the grounds of justifiable or excusable homicide as provided by the ample provisions of sections 195, 196, 197, Penal Code. █ An insane person is a person incapable of committing crime. (Sec. 26, Pen. Code.) This constitutes a special issue which is examined as such unmixed with any other issue. No other conclusion is possible under the wording of section 1026 et seq., Penal Code, as amended, other than that the matters (newspaper publications, letters and conversations had with his mother, etc.) which were offered on the trial of the issue of not guilty, as the exciting cause of mental disturbance, were relevant solely to the issue of insanity, and to none other. It could not be otherwise if any regard is given to the statutes. There could be but one sequence to appellant's contention. If any part of the evidence bearing on the question of insanity was admissible as to the issue of not guilty, no good reason can be urged against the introduction of all of the evidence claimed to be relevant to the issue of sanity. Such a result would lead to an absurdity. We would, in such a case, have the court and jury hearing evidence bearing on an issue which neither court nor jury has any power to decide but which, forsooth, might be considered in the determination of the only issue properly before them for decision. This would

be in violation of the mandate of a statute which this court has held to be valid and, further, opposed to our former ruling holding "that any evidence tending to establish the insanity of the defendant under his plea of not guilty by reason of insanity at the time of the commission of the homicide, other than evidence of the *immediate circumstances* of the offense would have been irrelevant and immaterial on the trial of the general issue as to the guilt or innocence of the defendant raised by the general plea of not guilty. . . . " (*People* v. *Troche, supra.*) (Italics ours.)

Under the general plea of not guilty, prior to the amendments of the statute, evidence relevant to the issue bearing upon mental competency but which had no relevancy to the issue of not guilty, was presented to the jury under the plea of not guilty and there is reason to believe that in many cases evidence as to mental competency in its almost illimitable field of exploitation had the effect of over-exciting the emotions of jurors by the introduction of matters not relevant to the question of guilt, to the extent of mitigating punishment in cases where it was not merited. Under the former system two issues were submitted in a single action. The intermingling of these issues provable by different degrees of proof may have caused some confusion in the minds of the jury. To remove such a possibility, as well as to prevent the jury from being influenced by matters which were solely relevant to the issue of insanity, may have constituted considerations which account in a measure for the changes made in the statute.

As to the admissibility of the questioned evidence, under the statute prior to said amendments, this court in *People* v. *Jamarillo*, 57 Cal. 111, announced the rule with respect to the jury's right of discretion in precisely the language approved in *People* v. *Perry, supra; People* v. *Troche, supra; People* v. *Hall*, 199 Cal. 451–456 [249 Pac. 859]. In the *Leong Fook* case, *supra*, this court, in commenting upon the exercise of discretion accorded the jury, cited the case of *People* v. *Witt*, 170 Cal. 104, 111 [148 Pac. 928], and called attention to the limitation placed by the Witt case upon the rule announced by the Jamarillo case. In the Witt case the issue of insanity was not made a specific issue. The evidence offered and refused admission did not include any of the facts and circumstances connected with the commission of the offense, but consisted solely of evidence relevant to the character and previous habits of the defendant. Justice

Richards, author of the opinion in the Leong Fook case, in discussing the Witt case said: "This court held [*People* v. *Witt*] that such evidence was not admissible for the sole purpose of enabling the jury to assess the punishment, in the event of conviction, at death or life imprisonment. This conclusion was adopted by the district court of appeal in *People* v. *Golsh,* 63 Cal. App. 609, 612 [219 Pac. 456], wherein the defense of insanity had been expressly disclaimed by the defendant. . . . " (206 Cal. 64, 69 [273 Pac. 781].)

It is convincing from the statutes themselves which specify the grounds upon which homicide is justifiable or excusable and from the decisions of this court that it was never the intention of the law that the two issues should be so commingled as to confuse the jury in its effort to obey the rules of law. The discretion which the jury may exercise must be determined from the facts and circumstances attending the commission of the offense. "Such other reasons" mentioned in the cases above cited must mean those which appear upon a consideration of the facts and attending circumstances relevant to the commission of the homicide, in short, the *res gestae,* and not stale, extraneous facts and circumstances which transpired two years or more before the homicide and which could not have "attended the commission of the offense", nor tend to justify or excuse it. But whatever argument may be made in support of appellant's views the question has been definitely settled by the provisions of section 1026 Penal Code et seq. and our decisions contrary to his contentions.

There would be but little merit in appellant's contentions if the law were as he contends it to be since many of the newspaper articles and provocative acts which counsel for appellant contends disorganized his mental powers to the extent that he was rendered irresponsible for his act, were admitted over the objections of the prosecution made on the grounds that said evidence was self-serving, hearsay and immaterial to the issue being tried. The offers which were admitted were representative of those excluded and the latter could have added nothing to the evidence which though erroneously admitted inured to the benefit of the defendant in support of his contention that it might be considered in mitigation of the punishment. In view of the evidence given by Mrs. French and several members of her family and published articles, letters and writings introduced by the defendant,

it abundantly appears that the parties thought, spoke and wrote illy of each other. The ultimate fact on the trial of the second issue being whether the defendant was insane, it follows that the things which caused his insanity were but probative matters by which insanity might be shown.

■ Some question is raised by appellant as to the sufficiency of the proof to support a finding that the homicide was committed in the county of Modoc.

The sufficiency of proof as to venue cannot be seriously questioned as it appears from the testimony of several witnesses that the homicide was committed at the home of the deceased, located at Alturas, county of Modoc, this state. This court will take judicial notice that Alturas is the seat of government of Modoc County, a political subdivision of the state. This proposition is too well settled by the authorities to require more than passing mention. Besides proof is ample from many sources that the deceased was killed in the McCracken home and that the McCracken home was located in Alturas, California. The map or plat offered in evidence descriptive of the McCracken premises, together with the illustrative testimony of the county surveyor, lays the venue beyond question in Modoc County.

■ Objection was made to the introduction of photographs in evidence showing the relative places or positions which Mr. McCracken and the two ladies occupied at the table at the time of and during the shooting, and also to X-ray photographs taken of the body of the deceased showing the point of entry of the bullets. The order in which the parties were seated at the time the defendant entered the dining room has never been questioned. A photographic illustration of the positions or order in which they were seated could in no way have prejudiced the defendant with respect to a matter which is not disputed, but which, on the contrary, has been seized upon by the defense as a circumstance so wanton in execution as of itself to give support to the issue of insanity. Absolutely no claim can be made that the shots were fired in self-defense and therefore a photograph of the room and the relative positions of the parties could not possibly have prejudiced the defendant. Likewise, the admission of two X-ray photographs showing the courses which the bullets took after entering the body could not have been prejudicial, if erroneous. The autopsy physician had described the wounds to the jury and the jury knew that the entry of the

bullets in the body had caused death. Therefore no prejudice could have resulted. Moreover, an examination of the X-ray photographs may have given the jurors a better understanding of the situation than they were able to get from the technical terms used by the medical experts. The course of the bullets was material as tending to show whether the body of the deceased at the time the several shots were fired was in an upright or recumbent or prone position. They were therefore relevant to the issue as to whether the physical evidence tended to show that the several shots were fired with a "willful, deliberate and premeditated" intent to take life. The course of the bullets was some evidence as to whether the deceased was in a falling position or was wholly prostrate on the floor. But if it could be said that the X-ray photographs added nothing to the oral testimony no harm could have been done the defendant by granting the request of the jury for further examination of the exhibits.

The situation is unlike a case in which the proof as to whether the defendant *committed* the act charged presents a close question. In such cases immaterial or irrelevant matters of a highly emotional or prejudicial character may so seriously tend to degrade and disgrace the accused in the eyes of the jury as to render it less considerate of his defense than it would have been had the prejudicial and degrading evidence been excluded. Where such situations are shown to exist, retrials must be granted, but here nothing is shown by the photographs which tended to establish a single controverted fact. The defendant claims that the photographs must have had very great influence upon the jury's deliberations from the fact that after retiring to deliberate it returned some time thereafter and asked for and was permitted to take said photographs to the jury room. The fact that said photographs were the only exhibits requested and eleven hours after receiving the exhibits the jury returned a verdict of guilty, is of no special moment. The jury entertained no doubt as to who killed McCracken. Their task was to determine whether the killing was done wilfully, deliberately and with malice. Contention that an inspection of said photographs did or could have inflamed the jurors' minds to improperly impose excessive punishment is too insubstantial to merit further consideration.

At the trial appellant adopted and urges here a three-fold defense, to wit: First, that the articles published in the Times

beginning August 27, 1934, and afterwards published in the Mail ending on the day prior to the homicide, together with the letters and telephone calls which Mrs. Gertrude French testified she received from the deceased, were sufficiently provocative to justify the homicide; second, that if the killing was not wholly justifiable, nevertheless the circumstances out of which it arose were such as should preclude greater punishment than life imprisonment, if not manslaughter; third, that the defendant was excusable on the grounds of insanity. A defense on provocative grounds necessarily assumes as its premises a sane mind. Insanity is predicated upon a totally different ground—lack of or disturbance of the reasoning faculties. They present inconsistent defenses.

It is the law, so long and firmly established in this state that no words of insult or reproach, however grievous, will justify an assault or threatening demonstration with a deadly weapon, that it will suffice merely to make reference to a few of the cases.

"Nothing is more surely calculated to arouse the blood of some men to a heat of passion than grievous words of reproach, yet no words are sufficient provocation to reduce an offense from murder to manslaughter and this principle is so well established in this state that discussion would be out of place." (*People* v. *Bruggy,* 93 Cal. 476 [29 Pac. 26]; *People* v. *Turley,* 50 Cal. 469; *People* v. *Manzo,* 9 Cal. (2d) 594 [72 Pac. (2d) 119].)

This rule thus early announced as the law of the state has never been departed from. In *People* v. *Jackson,* 78 Cal. App. 442, 448 [248 Pac. 1061], the rule was again stated in the following language:

"In considering what is regarded as such adequate provocation, it is a settled rule in law that neither provocation by words only, however, opprobrious, nor contemptuous, or insulting actions, or gestures without an assault upon the person . . . are of themselves sufficient to reduce the offense of an intentional homicide with a deadly weapon from a murder to manslaughter."

The jury, in the instant case, found upon overwhelming evidence that the killing was intentionally committed with a deadly weapon. The jury impliedly found that the killing was done with premeditation and deliberation and that the intent was formed without the presence of the deceased, and that quite an appreciable period of time intervened between

the formed intent to kill and the act of killing which was done after preparation made and upon reflection. No claim of sudden combat is made and no facts or circumstances were present which could have made applicable the defense that the homicide was committed "upon a sudden quarrel or heat of passion", as provided by section 192, subdivision 1, Penal Code. ▋ The act of killing may follow the intent to kill as rapidly as follow the successive thoughts of the mind. ▋ The court did not in any way limit the jury's consideration as to the degree of punishment it should impose. It merely limited its consideration of the so-called provocative evidence which was not material to the issue of not guilty to the single question as to whether it was sufficiently provocative as to justify a reduction of punishment should they find the defendant guilty of first degree murder. In all other respects the jury was given absolute and unrestrained freedom to return such a verdict as the evidence in their judgment would warrant. In fact the court instructed the jury that it might find the defendant guilty of murder of the first degree, imposing life imprisonment or the death penalty at its discretion; guilty of murder of the second degree; or manslaughter or not guilty. Murder and manslaughter were fully covered by the court's charge. Absolutely no fair or reasonable claim may be made that the jury was not free and untrammeled in the exercise of its judgment as to the degree of crime of which the defendant should be held guilty, if any. In fact, in its final charge on the trial of the general issue of not guilty the court in not less than three instructions told the jury it was its duty to consider the provocative evidence as bearing on the question as to whether or not it rendered the defendant "incapable of the deliberation and premeditation necessary to constitute malice aforethought."

Instruction No. 12 reads as follows:

"Provocation, as the term is used in law, means that treatment of one person by another which arouses passion and anger. In cases of homicide it negatives the idea of malice and premeditation because the hot blood engendered by provocation produces a temporary suspension of the reflective faculties, and the passion aroused excludes the idea of deliberation. Therefore, evidence tending to establish provocation may be considered by you, and if, after due consideration of such evidence you should entertain a reasonable doubt

as to whether there existed at the time of the homicide in the mind of the defendant the malice, deliberation and premeditation essential to constitute the crime of murder, it would be your duty to acquit the defendant of that charge.''

The above instruction and Nos. 11 and 13 opened the door wide for the consideration of the so-called provocative evidence for all conceivable purposes and leaves appellant no possible grounds for complaint.

Counsel for appellant rest their defense on the psychopathic condition of the defendant which it is claimed had its origin in the attachment and deep-seated affection for his mother from early infancy. They argue that an increasing devotion to his mother's well-being developed in him a sense of filial solicitude so overmastering that her cares became his cares and he became grieved to an inordinate and exaggerated degree whenever his mother manifested the slightest unhappiness. It is not contended that he was afflicted with general insanity, but it is claimed that his peculiar type of mental structure was overthrown by what he regarded as the unpardonable acts of McCracken and he acted on the impulse that he was justified in taking the life of McCracken. It is also contended that he was moved by an irresistible impulse to his act. Much of the newspaper controversy had no personal reference to the defendant but was directed to the policy of the Plaindealer and chiefly at Mrs. Gertrude French, its editor, with occasional thrusts in the nature of satire, lampoonery, or burlesque mention of the defendant, and Barr French, his father, and Jim Payne, his uncle, all of whom were in the public service. Occasional references were made to other members of the French family.

Mrs. Gertrude French, mother of the defendant, was called to the witness chair and the foundation was laid for the introduction of a long list of newspaper articles which appeared in the Times and Mail during a portion of the year 1934 to and including March 24, 1937. The same objections were made to this class of evidence as was made to the testimony of witness Hopfield, the first witness called by the defense, with the added grounds of hearsay. The objection was overruled and she testified to a great number of published articles and acts which she asserted were intended to humiliate her and to reflect on the good repute of the French family. Among other things, she testified that at some time in 1934 McCracken called her on the telephone and said,

"Hello, God, I have got the one greater than God." The probable meaning intended to be conveyed by the detached remark was that the deceased implied to Mrs. French a grandiose complex as to her importance and power in the politics of Modoc County and in directing social and business life. McCracken attributed an air of arrogance and hauteur to the French family begotten of the fact that Jim Payne, Mrs. French's brother, held a position in the national re-employment service; the defendant was in the employ of the state board of equalization, and his sister was in the service of the state. These circumstances were occasionally made the basis, in controversial differences between the parties, for insinuations by McCracken in the discussions of public and business matters, to the effect that the French family, speaking through the columns of the Plaindealer, were influenced in their advocacy of or opposition to matters of public concern, by the dictations of officialdom rather than by any consideration of general public welfare. In one issue of his newspaper McCracken printed a paragraph in which Jim Payne was quoted as having boasted of the great political influence the French family wielded in Modoc County and intimated that the family would use it against Sheriff Sharp at the next election in retaliation of his refusal to deputize a number of police officers sent from the southern section of the state to guard the northerly state line against a threatened excess of homeless wanderers into the state. These matters, it is claimed, greatly agitated Mrs. French and the defendant as she would relate them to her son quite frequently. She testified that she did not communicate the defamatory telephone messages and lost or destroyed letters which she received from McCracken to her husband, for fear that he would resort to acts of violence. She did continue to report them to her son and their effect upon him, as described by her, was extremely distressful. Several times he threatened to do McCracken bodily harm, but she restrained him in each instance. The defendant at times after she told him of her troubles appeared depressed and would walk the floor without saying scarcely anything; he could not apply himself to his work for quite a while thereafter; he became extremely restless. His state of mental equipoise was greatly disturbed by the unhappiness which said articles caused her. She testified she was often moved to tears and brought to the brink of nervous collapse while recounting to

748

the defendant the mental anguish which said articles caused her. Many of the articles which she testified had caused her and her son grievous mental suffering, were apparently retaliatory and were written in the heat of a bitter struggle for business and political supremacy in a community in which the field of journalism was limited. That the deceased on several occasions overstepped the proprieties which should be observed as canons of journalistic ethics, even though the controversy at times waged furiously, is apparent from an inspection of the few publications which are in part reproduced. Many of them were overstressed by Mrs. French and her son while others are too trifling to merit more than passing mention.

Upon calling its first witness the defense sought to show by Frank Hopfield, former editor of the sports column of the Plaindealer, that Hopfield in April, 1935, acting as a voluntary conciliator sought to make peace between the heads of the two newspapers but McCracken declared his determination of carrying the strife to a final conclusion. The prosecution objected to the admission of the line of evidence which had to do with newspaper publications or personal criticisms communicated by letters or telephone on the grounds that such evidence was irrelevant, incompetent and inadmissible as to the main issue, not guilty. The court ruled that while such evidence could not be deemed sufficient to justify the homicide the jury was entitled to consider it in mitigation of punishment. The court thereupon instructed the jury as follows: ''In other words, if the jury finds the defendant guilty of murder in the first degree they can take into consideration such evidence for the purpose of mitigating the punishment and recommending life imprisonment instead of the death penalty.'' The witness then proceeded to relate a conversation he claimed to have had with McCracken in April, 1935, approximately two years before the homicide, in which he asked McCracken why he didn't leave the Frenches alone and advised him that he, McCracken, having recently come into the community ''should try to get along with people instead of using the tactics that he did''. McCracken replied that ''he was out after their hides'' and he would not ''lay off'' until he ''broke them''. The witness said he communicated these words to Mr. and Mrs. French, the proprietors of the Plaindealer.

Harry L. Payne, an uncle of the defendant, testified that shortly after the election in 1936 the deceased told him he would "lay off" of him but he would not "lay off" the Frenches.

Mrs. Gertrude French testified at great length and most of the testimony which she gave was of the type referred to by counsel as "provocative" of the homicide. Much of it was trivial and consisted of passing quips and paragraphs written in the style of the columnist under heading such as "Around The Town", "This 'N That", or under headings cleverly phrased to catch the reader's eye. Among the published articles which Mrs. Gertrude French and appellant stress as being exceptionally provocative and as tending to disturb the mental balance of the mother and son was an editorial published in the Mail February 15, 1935. This issue was one of the earlier publications and indicated the policy which the paper would pursue. The editorial stated that "certain citizens with the welfare of the community at heart requested the writer . . . to establish an independent newspaper in the county. Immediately the forces behind the other alleged newspaper began throwing cat-fits with the peculiarities common to the feline breed." Among the things promised its readers were that the editor "will never grow so large that we believe we are God". Another promise was that the paper "will seek to never be carried away by chance of political advancement for ourselves or our relatives, to the extent that we will sell out the interest of the people of Modoc". No worthy cause will be without a champion and no wrong will go unopposed. "If a man bites a dog in Kankakee County that is news in Kankakee but we do not intend to run a temperature over it here. . . . We intend to try to carry a complete account of the doings of Modoc County people—each article will not injure some one. We shall seek never to diagnose the reason for a woman having a baby as due to the fact that she was a victim of an automobile accident a short while before."

The following excerpt is taken from a published article of April 5, 1935:

"A weekly circular, published in Alturas, piqued because it, in its guise of a newspaper, had missed forty news items . . . which were published in the Modoc Mail last week published a tirade of misinformation about the Mail editor. Thanks, Gertrude, for the 'free advertising' which you de-

clined to give us last spring. If you believe you can throw enough mud in your columns to dust over the eyes of the public enough that they overlook the fact your circular is devoid of news . . . then you are entitled to practice the sort of tactics in which you seem to enjoy to indulge yourself.''

Article of December 11, 1936:

'' . . . Mrs. Gertrude P. French appeared before the Board of Supervisors . . . to protest the payment of a claim of $16.97 to the Modoc Mail. The claim was for printing the report of the grand jury. It was published by court order. . . . The Plaindealer had a claim for $19.00 for the same job. The Mail did not protest it . . . The Modoc Mail is not desirous of seeing the Plaindealer people go hungry. . . . If and as when we become a meddlesome old lady we shall endeavor to protest items our competitors claim. Until then we will stick to our knitting. Inasmuch as there will perhaps be ample time later for Gertrude to sob over bruised pride, her tears at this point leave us singularly unaffected.''

April 5, 1935, the following matter appeared in the Mail, under the heading of ''Panaceas and Painkillers.'' Mrs. Gertrude Payne French is a daughter of H. G. Payne and a sister of Harry L. Payne commonly called Jim Payne. All resided at Alturas, were active in community affairs, and were closely united by family ties. The above alliteration was a play on the family name Payne. The author of the article wrote that he always believed ''that a person addicted to grandiose ideas . . . always suggested . . . that anything couldn't be done . . . without their aid . . . One of our modern painkillers . . . in Alturas . . . you know who I mean . . . has always insisted . . . that it was in business . . . because of some God-given right . . . which accidentally precipitated . . . the perpetrators of this rag . . . into this region . . . a hundred years ago''.

September 8, 1936:

''Some folks are wondering if Sales Tax Harry is French, Latin or Greek. One more cent please.''

A matter to which publicity was given by the Mail on several occasions in 1935, and which was bitterly resented by the owners of the Plaindealer and the French family, consisted of a statement which R. A. French, business manager of the Plaindealer, was charged with having made with re-

spect to a proposed concert to be given by the local high school under the auspices of the American Legion. The remark charged to him in disapproval of the Legion sponsorship of the concert was: "That gang doesn't enjoy a good reputation here." The alleged statement was scathingly rebuked by the Mail in the following words: " . . . when a two-bit newspaper publisher presumes to lift himself above the crowd it looks bad. When the one-time heroes whom all of us cheered in 1917 are referred to as 'that gang', and slurred by any citizen not in service in the recent unpleasantness, it smelleth to heaven. . . . 'Me and Gott' was the alleged slogan of Wilhelm II in 1917. R. A. French does not include the latter in his books. It is just 'me'. The firemen were criticized by the worthy gentleman because they gave an advertisement to the Modoc Mail."

The several announcements published by the Mail in 1935–1936 that there was definite assurance that at least two newspapers were to enter the field at Alturas, which had "suffered from lack of newspapers" in the past, accompanied by warm words of welcome were offered as provocative and exasperating conduct on the part of the editor of the Mail.

The following "Open letter to a well wisher", appeared Oct. 9, 1936, and is listed as one of many grievances which justified the homicide or rendered it excusable on the grounds of insanity. It reads:

"Dear Gertrude: I understand that you have been having trouble with your bird cage. I am mailing you the Mail. It is thicker than the paper you edit. Perhaps if you fold it and are careful, you might utilize it in the bottom of your bird cage until the next time we publish, at which time you will be at liberty to clip out all news you had previously overlooked and publish same for your new clientele.

Thank you for your courtesy.

L. & K.

CLAUDE."

It is claimed the letters L. & K. were intended as abbreviations for Love and Kisses, and that same was meant as an insult to Mrs. French.

In an undated letter to her he said:

"You just can't keep that tongue of yours telling the truth, can you? . . . Another funny one regarding the non-committalness of Councilman Morgan, on the closing of

gambling. Did it ever occur to you that it isn't quite cricket to ask a public official why the law is being enforced? I wish to apologize to Bard. (Her husband.) I came down town Thursday with a dirty shirt on and was mistaken for Bard by at least three persons.

"Love and Kisses

"CLAUDE L. McCRACKEN."

McCrackcn was the local representative of the United Press and the Associated Press. It is clear from the record that the Plaindealer had challenged the accuracy of the news he had sent by wire to the press from Alturas. He wrote several sharp letters to Mrs. French charging her with wilful misrepresentations as to the accuracy of several of his news items. Her action, he claimed, was actuated by a desire of discrediting him with the managers of the news service as a correspondent. The following letter, dated January 23, 1936, addressed to Mrs. French, admitted in evidence, is claimed to have been a source of great mental disturbance to her and to the defendant:

"My dear Gertrude:

"Here is a letter to the editor which you will not print because it isn't a bouquet.

"In your last issue you made the assertion that one 'overzealous' reporter sent the report to the press that Alturas was under water, etc., etc. Now, Gertrude, you shouldn't have done that, because when you did you uttered and published a malicious lie, wholly without foundation, in fact, something you might have verified by asking a few questions before rushing into print. I have no scruples in calling a woman (notice I didn't say a lady) a liar, so I hereby notify you that you are an unscrupulous, infamous, notorious and utterly indefensible liar. I might sue you for libel, but a judgment against you would be worth about as much as six bits in confederate money. I really shouldn't waste my time calling you on this because you can't get as little a thing as the appointment of Dr. John Stile as Superintendent of the hospital correct when that appointment is published on the minutes of the Supervisors. I naturally assume that you are accustomed to popping off your mouth without regard to truth.

"You may consider this a written notice to you to keep my name, or any reference to me, out of that sheet you erroneously term a newspaper.

"I am also signing this with a salutation you can't imitate.

"Yours truly,

"CLAUDE L. McCRACKEN."

Before closing consideration as to the admissibility of said articles offered on the issue of not guilty, all of which we have held to be inadmissible, with the possible exception of those published in three or four successive issues immediately preceding the homicide, about which the defendant testified, it may be proper to consider the following article, which appears to have been denied admission on the first issue but which was admitted on the insanity issue. The erroneous admission of evidence similar in character did not affect the rule of law as to what may constitute legal evidence. The errors made redounded to the defendant's benefit. Said article is marked defendant's exhibit "J" and was published on December 27, 1934. It follows:

"AROUND THE TOWN

"Getting subscriptions for the Times is pleasant work . . . listen to the story told by a young matron . . . The climax was nearing . . . I knew what was coming but I was putty in his hands . . . did not have the power to stop him . . . should I accede to his desires? . . . I listened to his passionate appeals and felt weak . . . I was but a woman alone and with no one to keep me company . . . what should I say? . . . I tried to get a grip on myself . . . How could I say no to the poor boy . . . Suppose I did as he wished . . . who would know? . . . Harry was away . . . Nevertheless I felt weak . . . All right boy . . . I almost whispered . . . I'll subscribe for your paper' . . . "

The defendant testified that the article could have referred to no one else but his wife and himself as there was no other young matron in the town whose husband's name was Harry who was likely to be away from home a great deal of the time, and that the article was intended as a slur on his wife. The above article, if intended in the venery sense which it seems capable of interpretation, is by far the most reprehensible and the least defensible of any of the articles which appeared in print. It was, however, printed more than two years prior to the homicide and if the particular article was

intended to suggest immoral propensities or tendencies on the part of defendant's wife it does not appear that any reference was thereafter made to such propensities during the two years of intermittent newspaper strife that followed. The Times was at that time published by C. D. Fitzpatrick and edited by Mr. McCracken. If the article complained of was intended to mean what the defendant interpreted it to mean, the author was amenable to criminal prosecution by virtue of our criminal libel statutes as well as to an action for damages against the publisher of said newspaper. Under the well settled rule, the publication could not have justified a homicide committed two years thereafter.

Mrs. Gertrude French testified that some time prior to March 4, 1937, McCracken called her on the telephone and told her that he was going to start a guessing contest department in the Mail so "blase" that the people would not know who was meant by the names used, but she would be the subject of the story.

On March 4th the following advance explanatory article appeared in the Mail:

"Contest Department. We announce . . . that we'll start a contest soon . . . to determine a few names . . . in a story so blase . . . it might be titled . . . quote . . . It can't happen here . . . unquote . . . but we laugh . . . and we feel you will . . . and maybe you'll guess . . . the names of the parties . . . to whom we will refer . . . I'll start Monday . . . in the Modoc Daily Mail . . . and it'll be continued . . . until it is guessed . . . don't miss it . . . "

As a part of the announced plan the following articles appeared, the last being published on the day preceding the homicide:

March 20, 1937: "Mayor William J. McCracken of Oakland announces his city will be ready to receive the entire world at the big world's fair in 1939."

"Cecil Payne, the murderer of the Chief of Police of North Sacramento is appealing for clemency from the penalty of death under which he is sentenced."

March 22d: "T & WA Manager William P. McCracken shows that air passenger travel miles were safer last season than ever before . . . N. H. French, a former employee of the state, is trying to keep from being convicted of accepting a bribe in Los Angeles."

March 23d: "Dr. Henry Nobel McCracken, President of Vassar College, was recently the subject of an entire edition of Life, the new picture magazine . . . W. A. French of Kansas, expects to get out of the pen soon where he is confined for stealing money."

March 24th: "The last man hanged for horse stealing in Teton County, Montana, was named Burr French. . . . Former Congressman Robert McCracken of Teton, Idaho, observes his sixty-seventh birthday today. . . . He was once a nominee of the Republicans for Governor of that state. . . . He was no relation to the Modoc Daily Mail editor."

The last several issues of the paper were published daily. The publication of these latest articles was stressed by the defendant as being the exciting cause of his act in that they aroused in him a feeling of great indignation and urge for retribution.

Besides the many articles admitted in evidence at the trial of both issues, Mrs. French claimed to have received a number of letters from McCracken which attacked the moral character of her daughters and tended to defame and degrade the French family and the relationship, which appears to have been numerous in Modoc County. She was unable to produce any letters except those which were received in evidence or marked for identification. The only letters which she produced included the one set out in full herein and a few others which were in the nature of personal rebukes arising out of newspaper competition. The defendant testified that quite some time prior to the homicide, during 1936, he opened his mother's desk and by chance discovered four or five letters which she had laid aside. He read them. He said they were of the type described by his mother and contained charges of immoral conduct on the part of his sisters. Both Mrs. French and the defendant testified that they took one or two of the letters written by Mr. McCracken to the district attorney with the purpose of proceeding criminally against him, but the district attorney advised against criminal action as he was doubtful as to the contents of the letters amounting to criminal libel. He also advised that a conviction would be unlikely in cases where the cause of action was an inseparable part of a prolonged newspaper quarrel in which the publishers of rival newspapers had written their worst against each other. Mrs. French said she and the defendant took one of

the letters of the United States postal authorities, but were told that the letter did not warrant action on the part of the government. Mrs. French presented three or four letters during trial which she had preserved, but none contained any reference to her daughters bearing illegitimate offspring which she and her son testified was written in lost or destroyed letters. Neither does it appear that any such letter was exhibited to the state or federal officers. All of the letters produced were of the tenor of the one dated January 23, 1936, set out in full herein.

It appears in the testimony of the defendant that the tires of his automobile were cut in 1935 and he became suspicious upon investigation that McCracken was guilty of the offense. He made complaint to the district attorney, who, after investigation, advised against the filing of a complaint charging McCracken with the offense. It appears that other acts of tire cutting had occurred at Alturas about the same time and the Plaindealer had published articles severely condemning the persons engaged in this kind of vandalism. Mrs. French testified to an incident of a man presumably peeking through the window of her bathroom while her daughter was taking a bath, and upon being discovered said person ran from the scene. Her informer who claimed to have seen the act was unable to positively identify the man in the darkness. Mrs. French was of the belief that it was McCracken. She related another incident in which she said McCracken fired shots or set off some kind of explosives over her head, and "laughed and laughed" at her consternation. On the other hand, McCracken in an issue of his paper published March 29, 1935, printed a part of an anonymous letter written to Mr. McArthur, presumably a financial backer of McCracken, in which the writer advised Mr. McArthur to withdraw his support from the Mail, giving his reason therefor. McCracken in a published comment on the style and phraseology of the letter and the paper on which it was written intimated that the Plaindealer was the source and inspiration of the anonymous letter. Another letter written to McCracken and threatening him with "a long ride" if he didn't lay off the tax question was credited to the same source in a printed article.

The Plaindealer contended that the dissolute revelries in which intoxicated Indians indulged was chargeable to the inefficiency of the sheriff's office while McCracken charged

that the fault was with the state board of equalization which had issued fifteen liquor licenses for the sale of liquor in Alturas, a small community. McCracken charged the board with having totally failed in proper and efficient control of the liquor problem. The defendant was an employee of said board.

Mrs. French, defendant and one or two of his intimate friends testified that the defendant had expressed himself on several occasions as entertaining fears that McCracken might kidnap or injure Bobby, his young son. Mrs. French testified that on one occasion McCracken warned her that something might happen to him. She also said that he once telephoned her that the defendant would not be home that night as he had been arrested on a charge of embezzling public funds.

A large mass of the so-called "provocative" evidence, not specifically referred to herein, arose out of events that transpired in the year 1935. Much of it is not only exceedingly remote but was irrelevant and immaterial to any issue in the case except possibly as to insanity in some instances. All of it was offered by the defense and that which was admitted went to the jury for consideration on whatever theory the defense chose to adopt, not inconsistent with the law of homicide.

We now come to a consideration of the things that occurred a few hours before the killing. The defendant was a member of the 20–30 Club and belonged to a social set which frequently met at the family homes of a group of young people who amused themselves by playing ping-pong, pinochle, and such other games as come and go in the seasonal order of social activities. He was also a member of a gun club which held contests in pistol target practice. He was a good pinochle player and he was rated as a good ping-pong player. On the afternoon of March 25th the defendant drove in his car to the Tavern, where he was accustomed to meet with his close personal friends for a social period. The Tavern seems to have been conducted after the fashion of a club. It served liquors, and furnished tables and apparatus for those who desired to play ping-pong and other kinds of games. The defendant arrived at the Tavern between 4 and 4:30 o'clock P. M. His friend, Robert Dorris, was in the Tavern when he arrived and several others of his circle came and left while he was there. The defendant and Robert Dorris engaged in

playing ping-pong from about 4:30 to 6:30. Dorris said that he won. At the conclusion of the game defendant wrote a check for $5, but Dorris said he tore it up inasmuch as the money should be put up on every game. They had, however, played for cash stakes. At the conclusion of the game the defendant said to Dorris: "You may be able to beat me at ping-pong, but I am betting twenty bucks you cannot beat me at target practice tomorrow." While in the Tavern Dorris told him he would take him home. They walked out together. Dorris got in his car and he thought the defendant started to get in when Johnny Justis and defendant's wife drove beside the Dorris car and the defendant went over to where his wife was seated in the car and talked a minute or two with her and then walked around a near-by street corner where he had parked his car and drove to the gun store, where he procured cartridges and a pistol. Dorris could not hear the conversation between husband and wife. Justis did not testify in the case. Neither Mrs. Vayle French, defendant's wife, nor the defendant, in their testimony made any reference to anything said by either in their last conversation immediately preceding the homicide. The things that transpired upon defendant's arrival at the gun store and subsequent to his purchase of the revolver have been told.

There was nothing notably unusual about the defendant's demeanor during the two hours he was in the company of Dorris. Evidently his several brother club members who were also at the Tavern did not observe anything which could have reasonably given them any cause to suspect that he was not mentally normal.

Deputy Sheriff and Jailer, George M. Kelley, called by the defense on the insanity issue, testified that he entered a barbershop slightly in advance of the defendant on the forenoon of March 25, 1937, and they joshed about Kelley beating the defendant to the "next" turn. Kelley said he observed him before he sat down, and he saw there was something wrong with him. He expressed himself in these words: "It struck me there was something wrong. I could not say what it was." He further testified that he and the defendant joshed like they always did when they met under similar circumstances. He talked rationally and he understood him. He waited his turn in the shop. The deputy sheriff also testified as to the arrest of the defendant and his conduct since he had

been confined in jail and in his care. He appeared rational at all times. . He received company, played cards with visiting friends and inmates of the jail and his appetite was good. He sometimes complained of being hungry. The deputy sheriff had visited him many times and discussed matters generally with him and had found him at all times entirely rational. He slept soundly at night.

A number of defendant's intimate friends, family relations and acquaintances were called to give specific examples as to the temperamental qualities of the defendant. His mother gave a detailed account from his birth of all the diseases he had suffered and described the physical and mental oddities and idiosyncrasies which he had exhibited during his entire life. Dr. John Stile, thirty-three years a practicing physician at Alturas, had attended to the defendant's medical needs since he was about nine months of age. He testified that he had had all the diseases common to the childhood and adolescent stages such as measles, whooping cough, and rickets, and in addition St. Vitus dance and infantile paralysis which manifested itself in his lower limbs at the age of nine years. His full power of locomotion was not regained until some time thereafter. His appendix was removed in early manhood and at the same operation the surgeon discovered and removed a growth or pouch which had formed on an intestine and which is known in medical science as Meckel's diverticulum. It is medically described as a blind tube connected with the lower ileum. It has no special or peculiar significance with respect to mental soundness. His physical health was described by the doctor as frail, his weight being much under normal for a person of his height and age and he was described as a highly nervous and neurotic person.

Dr. Edward W. Twitchell, a clinical psychiatrist on neuropsychiatry to the San Francisco City and County Hospital and consulting psychiatrist to the Alcatraz Federal Prison, testified that he had read the record evidence and had made physical examinations of defendant regarding his nervous system, and had given consideration to the family history and his past life in all its details including reports that some of his relatives had been pronounced insane; also his illnesses, education, occupations and other matters which may have affected his life. He described the defendant's physical build as long limbed, very slender, long oval face, a long thorax

and rather sharply defined features. He observed evidences of the defendant having had the rickets in infancy. He pronounced him to be of the asthenic type. He took into consideration all of the diseases which he had suffered, including several attacks of "flu" and the operations for appendicitis and removal of the bowel appendage heretofore described. He placed the defendant in the group of schizoids. Persons in that class are introverts, they live within themselves. They are dual or split personalities—they have two personalities. "They will do things one time entirely different from the things they do another time." He testified that persons in the above classification may appear normal and go unnoticed by intimate acquaintances for long periods until "the thing bursts forth and becomes patent to the world". He testified that he felt that a man may be insane and still exhibit marked ability in practically all the affairs of ordinary life. His belief was that the defendant had been emotionally surcharged for weeks or months before he committed the act which, when done, immediately relieved his mind from a burden which rested upon him. The specialist said he believed that the defendant thought he was not only doing right by killing McCracken, but he believed he was destined to do it. The alienist said he was able to reconcile those portions of the evidence which might appear to be consistent with the deliberate and preconceived act of a sane person with the theory of insanity and gave it as his opinion that the defendant did not know that he was doing a wrongful act.

Two other physicians and surgeons, Dr. Philip McKenney and Dr. John Paul McKenney, both practicing their professions in Alturas, and with personal acquaintance with the defendant, qualified as experts in nervous diseases, gave it as their opinion respectively that the defendant was insane and was not conscious that the act he committed was wrong. The opinions of said alienists were based largely on the testimony given by near relatives and intimate acquaintances of the defendant and in many cases it consisted of isolated acts of passing moment which may have appeared strange or exceptional to the observer who was without knowledge of the many and various undisclosed thoughts which operate upon the human mind. A number of the things testified to by his intimate acquaintances and which were incorporated by the

experts as elements considered by them as indicating insanity may have been repudiated by the jury as being too insubstantial to support their conclusions, or the jury may have discredited such testimony. The record discloses several examples cited by intimate acquaintances as indicating eccentric or abnormal conduct on the part of the defendant. The jury may well have regarded and probably did regard the defendant's conduct in some of the cited cases as the exercise of good judgment. One of such instances had to do with his refusal to readmit party guests who had returned to his home at the hour of 2 o'clock in the morning with a supply of liquor; another was his insistence on his companions leaving a bar upon the repeated requests of the proprietor that the closing hour had arrived and his license would be canceled if he did not obey the closing ordinance. Another had to do with a conversation had on the forenoon of the homicide with Dr. Philip McKenney, the alienist, at his office. It seems that the defendant had brought some tickets to him to be used for some future social event. The doctor had recently built a new home. The defendant expressed a desire to build a new home. The doctor's impression was that the defendant was not in a position to build a new home. He and the defendant discussed, at some length, the financial problem of building. The defendant asked him how he liked his new home and said he thought they would sell their house and build a new one. The doctor said that the thing which defendant admired most was the tiled bathroom, "and he insisted he wanted one like it in his house". "Q. (By Mr. Howe.) In other words, he was going to build a new house to get a tiled bathroom? A. That is the way it struck me." It by no means follows that the conclusion reached by the witness that the defendant was desirous of building a new house for the main or sole purpose of having a tiled bathroom similar to the one built by the doctor was warranted by the facts as related by him. It is also true that the alienists for the defense in forming their opinions as to the irresponsibility of the defendant took into consideration the long strain which the newspaper strife had upon his nervous organism, which they believed had been affected by the sicknesses which he had suffered and the excitations caused by the articles and letters heretofore set forth. The records contain evidence that in youth he was

jovial and happy in disposition but that during the past year or more he had exhibited spells of moroseness and irritability and had assumed a more serious aspect. There was also testimony that he had expressed much fear that McCracken would kidnap his young son and he had furnished his wife with a rifle and instructed her as to its use should an emergency arise when he˙was absent from home attending to the business of his office, which was quite often. His wife testified that during the latter months he took the boy to his own bed. She said he was very nervous at times and would get out of bed and smoke cigarettes for a considerable while. It was also testified to by an intimate acquaintance that on one occasion he seemed to be unusually depressed and upon inquiry as to the trouble, he exclaimed, ''If McCracken would only leave my mother alone.'' Several times he expressed apprehension that McCracken might injure his son. When McCracken's name was jocularly brought into conversation by his club associates his discomfort was instantly noticeable by his face changing color and by the period of moroseness which followed.

The defendant was exceptionally active in social and club affairs. While a number of his intimate friends testified to acts and described incidents and conditions which, standing alone and unexplained, may be regarded as unusual conduct, their close social relations with the defendant continued unbroken to the day of the homicide. None of his intimate acquaintances was asked if he believed the defendant to be insane as provided by section 1870, subdivision 10, Code of Civil Procedure, or if he believed he knew the nature of the act he committed and that it was wrong to commit it.

The court, by authority of the provisions of section 1027, Penal Code, selected and appointed the following alienists to examine the defendant and investigate his sanity: Dr. Edward M. Hummel, for five years one of the assistant physicians at the Mendocino State Hospital; Dr. Joseph Catton, who qualified as having had a wide experience in state and federal institutions maintained for the study and treatment of mental and nervous diseases; and Dr. Waldo H. Pate, a practicing physician of Alturas, Modoc County. The examinations of the two first named cover many pages of the transcript and touch every phase of the subject of insanity which could in any way apply or relate to the mental con-

dition of the defendant both before, at the time of and immediately after the homicide. Upon an extended review of the evidence adduced by the defendant (which was assumed to be true), and conceding the defendant was a neurotic, Dr. Catton was decidedly of the opinion that the defendant was not insane on March 25, 1937, or at any other time and that he was conscious that he was doing a wrongful act. The other alienists called by the court were also of the opinion that the defendant was sane and was conscious that he was committing a wrongful and unlawful act punishable by law.

█ Aside from the testimony given by the experts, it is the law (1127b, Pen. Code) that "the jury is not bound to accept the opinion of any expert as conclusive, but should give to it the weight to which they shall find it to be entitled. The jury may, however, disregard any such opinion, if it shall be found by them to be unreasonable". In the light of the facts and circumstances of the homicide surely this court would not be justified in holding that the defendant had proved by a preponderance of evidence that he was insane at the time he fired the fatal shots.

█ Counsel for appellant make numerous complaints of alleged misconduct on the part of opposing counsel and the failure of the court to admonish counsel for their transgressions. Many of the complaints are as to trivial matters which frequently occur in the trial of causes and make no lasting impression on anyone except the counsel who feels aggrieved. None were so devastating as to cause the jurors to so far lose their sense of duty and proportion as to be carried beyond the realm of reason by the caustic remarks of adversary counsel. The trial of cases should be conducted in an orderly manner and with due respect to opposing counsel, but where the infractions occur under circumstances such as could not have affected the judgment of reasonable men, a new trial will not be ordered.

█ The jury returned its verdict of guilty on July 2d. After some discussion as to the trial date, in which the court, counsel for both sides and the jurors took part, Mr. Howe, attorney for defendant, consented to setting the trial on the insanity issue to begin July 6th. He was agreeable to any date that would suit the jury. The court therefore ordered a recess until July 6th. Before court adjourned the district

attorney took occasion to "thank the jury for bringing in a just and right verdict in this matter". Mr. French, attorney for the defendant, assigned the remarks as misconduct and prejudicial to the rights of the defendant. A short discussion followed as to the return of witnesses and the court was about to adjourn when attorney French reverted to the incident of the district attorney expressing to the jury his approval of their verdict. He asked that the jury be admonished to disregard the remarks of the district attorney in view of the probability that the same jury, perhaps, would try the next issue. The court thereupon admonished the jury in the following words: "Oh well, you will disregard those remarks of the district attorney, ladies and gentlemen of the jury." A recess was then taken to July 6th.

Upon the reconvening of court defendant's counsel moved the court to declare a mistrial and vacate the verdict which had been rendered before the alleged misconduct had occurred because of the remarks of the district attorney last above set forth and on the further ground that the jury was excused without the court having admonished it as provided by section 1122, Penal Code. The assigned misconduct was a proper matter to be presented on a motion for a new trial. Courts will not halt the trial of a cause to consider mere errors which may be presented in an orderly manner and in the time provided by law. The misconduct complained of could have had no possible bearing on the issue which had been disposed of. The only issue undisposed of was the issue of not guilty by reason of insanity which was triable by the same or before a new jury in the discretion of the court. ▮▮▮ This court will not, except under exceptional circumstances, consider questions which are not properly assigned as prejudicial error, nor presented in the briefs of counsel. We have, nevertheless, considered the contention that the jury was not admonished, as provided by section 1122, Penal Code, at the time the recess was taken for a period of four days by reason of intervening nonjudicial days following the return of the verdict of guilty at the conclusion of the trial of the issue of not guilty. Granting as a fact that the omission to admonish the jury did actually occur on said occasion, as now claimed by appellant—a failure not countenanced by the statute—it was, in the light

of the facts as found by the trial court, a "technical error" and "not of that importance to demand a reversal of the judgment and a new trial". (*People* v. *Coyne*, 116 Cal. 295, 297 [48 Pac. 218].) Prejudice will not be presumed from an omission to give the admonition if no injury appears to have resulted from such omission. (Art. VI, sec. 4½, Const.; sec. 475, Code Civ. Proc.) The question of alleged prejudice by reason of the alleged omission was heard by the trial court on the motion for a new trial, and its implied finding on this issue finds ample support in the record.

The denial of appellant's motion that the issue of not guilty by reason of insanity be tried by a new jury was a matter resting in the discretion of the trial judge and we cannot say that the court abused its discretion. It is noteworthy that this request was not made until after Mr. R. A. Payne had, according to his affidavit, approached two of the jurors during the recess of court and undertook to engage, them in a discussion of the case. Upon this circumstance the defense, predicates a claim of prejudicial error.

Said R. A. Payne made an affidavit that on the morning of July 2d after the jury had returned its verdict of guilty, at about 11:45 A. M., he was at the bar of a cafe in Alturas, known as "Slim's Place"; that also present at the bar were William Mayben, C. E. Atkinson, and E. C. McConnaughy, members of the jury which had on that morning returned the verdict of guilty against the defendant; that said Payne inquired of said E. C. McConnaughy, foreman of said jury, whether it was proper for McConnaughy to discuss the case and McConnaughy replied that they were at liberty to talk as far as the "last case was concerned; that none of them knew anything about the case that was coming"; that C. E. Atkinson, later and as a part of the same conversation, in substance said: "It is getting so now days that if anybody does anything they use the plea of insanity and get out of it;" that shortly thereafter at the same place in the presence of George Tierney, said Atkinson further said with respect to the trial ended: "They tried to inject a lot of dirty stuff into the testimony;" that in the same conversation Atkinson also said: "A fellow has got to be pretty careful what he says as the Frenches is a pretty prominent family."

The truth of the foregoing affidavit at the time the motion for a new trial was noticed to be heard, to wit, July 19th, was, by said McConnaughy and Atkinson in separate affidavits traversed as to every material averment of the purported conversations contained in the Payne affidavit, and specifically as to those portions which make reference to the defense of insanity being invoked where no other defense is available; that dirty stuff was injected into the case by the defense and that the French family was prominent and "a fellow" has to be careful as to what he says about them. Payne's affidavit was not traversed at the time appellant made his motion on July 6th to vacate the verdict previously returned but it was completely met by affidavits on the motion for a new trial.

Another of appellant's contentions is that the court committed reversible error by the admission of the proceeding had before the judge which arose out of the refusal of defendant's counsel, participated in by the defendant himself, to permit the alienists appointed by the court to examine the defendant under the authority of section 1027, Penal Code, which provides that "When a defendant pleads not guilty by reason of insanity the court must select and appoint two alienists, at least one of whom must be selected from the medical staffs of the state hospitals, and may select and appoint three alienists at least one of whom must be selected from such staffs, to examine the defendant and investigate his sanity. It is the duty of the alienists so selected and appointed to examine the defendant and investigate his sanity, and to testify whenever summoned, in any proceeding in which the sanity of the defendant is in question. . . . "

The three alienists selected by the court attempted to comply with the provisions of said section before the case came to trial but were met with refusal on the part of the defendant on the advice of counsel to submit to any examination or answer any questions propounded by said alienists or to cooperate with said alienists in any respect whatsoever on the grounds that the statute compelled the defendant to be a witness against himself and was in violation of article I, section 13, of the state Constitution. Said alienists separately visited the defendant and informed him of their purpose and also visited his attorneys in an attempt to perform

the duty for which they were selected, in the presence of the defendant's attorneys and any other persons whom they might desire to have present at said examinations. All efforts having failed, the matter was brought before the trial judge by the district attorney with the defendant's attorneys, the defendant and the district attorney being present. After discussing the matter at some length with the court, counsel for the defense, with the approval of the defendant, definitely stated that they would ignore any order made by the court requiring the defendant to submit himself to a physical or mental test bearing upon his plea of not guilty by reason of insanity. During the trial of the issue of the defendant's sanity the district attorney offered in evidence the proceedings had before the trial judge in the presence of the defendant and his counsel as to whether the defendant would persist in refusing to submit to an examination by the alienists appointed by the court. Considerable argument was made by the defense in support of their refusal.

The court assured counsel that no questions would be asked the defendant bearing upon the commission of the homicide. The court said to the defendant, in the presence of his counsel, Mr. Baldwin, that Dr. Catton, one of the appointed alienists, had reported to him that the defendant had refused to talk with him at all. The court further explained that the alienists were appointed without suggestion of anyone and were presumed to be, and were, he believed, entirely unprejudiced in the matter; that he had instructed them not to refer in any manner to the homicide. He asked the defendant if he still refused to have any conversation with the alienists, and his attorney, Mr. Baldwin, replied that he would continue to refuse. The court then asked the defendant if that was his attitude and he replied that it was. Mr. Baldwin called the court's attention to the fact that the leading counsel in the case, Mr. Howe, was not in the city and intimated that he should have an opportunity to be present at the hearing as he did not deem himself authorized to consent to the defendant submitting himself for examination. On June 11th the court convened for the purpose of taking up the matter of the defendant's refusal to submit himself for investigation. Messrs. Howe, Baldwin, the defendant, and the district attorney were present. After

considerable discussion of the matter the attorneys for the defense took the position that the defendant could not be compelled to permit the alienists to question or examine him as it would, in effect, compel him to be a witness against himself. The court attempted to point out the benefits the statute was intended to confer. Finally, after the court had offered to place any reasonable restrictions on the examination the defense might suggest, counsel made it absolutely definite that the defendant would not answer any questions bearing on his physical or mental health, which he had put in issue by his special plea, or submit to any kind of an examination under limitations or otherwise.

The court, after receiving refusals of suggestions made by it as to the conditions which should govern the examination, made the following comments which are set forth without setting out the context of which they are a part: ''This seems to me to be a deliberate effort on the part of the attorneys to handicap the alienists in their efforts to determine the state of mind of the defendant at the time of the commission of the offense. . . . '' Later: ''It seems to me you are treading very close to the border line of contempt of court in instructing the defendant not to talk to the alienists.'' Later the following occurred: ''The Court: Mr. French, do you still maintain the position heretofore taken, that you are not to talk to anyone outside of your attorneys, and to those alienists especially, in regard to anything? Defendant: Yes sir; I do. The Court: And you are doing that on the advice of your attorneys? Defendant: I am doing that because I want to. I believe that is right. The Court: Well, there is nothing further to be gained, I guess, by continuing this examination. We have the attitude of the defendant and his attorneys, that they will not permit him to have any conversation with the experts appointed by the Court.''

Mr. Howe made a lengthy statement in which he disclaimed any intention to appear disrespectful to the court and that he opposed the examination of the defendant as a legal duty which he owed to his client.

At the conclusion the court said that it could not help believing that the attitude taken by defendant's counsel was done for the purpose of handicapping the experts as to the

condition of the mind of the defendant at the time of the commission of the homicide.

The introduction in evidence of the transcript of the proceedings had upon the complaints of the alienists that they had been denied by defendant's counsel the privilege of examining into his mental condition was opposed by his counsel on all pertinent grounds and after its admission a motion to strike all reference to the proceedings was denied.

Appellant cites *People* v. *Strong*, 114 Cal. App. 522 [300 Pac. 84], to the point that section 1,027, Penal Code, does not compel the defendant to submit himself to an examination and if he does so his action is purely voluntary. Granting this to be true, section 1027 was adopted, partly at least, to protect defendants, particularly those unable to pay for expert testimony. As pointed out by Mr. Wigmore in a quotation contained in the Strong case, the partisan selection and payment of experts by the prosecution and defense, and the partisan attitude of such experts, has caused a loss of faith by juries and the public in expert testimony. When their selection and compensation are provided for by statute this partisan feature is removed.

Whether a statute requiring that a person who enters a plea of confession and avoidance, such as insanity, shall submit to the examination provided by section 1027, Penal Code, under penalty that if he refuses to do so he places himself within the rule of the 1934 amendment of article I, section 13, of the state Constitution (which provides that if the defendant in a criminal case does not testify or fails to deny any evidence or facts in the case against him, that such facts may be commented upon by the court and counsel and considered by the court or jury), would, under the amendment of 1934, be held to be in conflict with another clause of the same section which provides that no person on trial in a criminal case shall be required to be a witness against himself, need not here be decided. This much is true. The defendant did not comply with section 1027, Penal Code, and the only question before us for decision is whether the introduction of said proceedings constituted reversible error. It cannot be questioned that anything done or said in the proceedings if relevant to his mental state would be admissible. The proceedings disclose that he

was conscious that his mental responsibility was under investigation and that he was acting in concert with his counsel who were directing his defense and therefore constituted evidence as to his mental condition.

It will be noted that the court did not criticize the defendant, but it did feel that the defense attorneys were rendering inoperative a statute which was intended to inure to the benefit of the defendant as well as to the improved administration of criminal procedure. The defendant's refusal to give any history or information as to his alleged mental ailment had been testified to by the several alienists appointed by the court and his refusal and conduct and all that he said was evidence in the case. Moreover, the court gave numerous instructions to the jury that they were not to consider the court's action on any ruling as indicating its opinion for or against the defendant's guilt. The jury was repeatedly instructed that their verdict must rest solely on the independent conviction of each juror.

The criticism by the court of counsel's advice to defendant to refuse to submit to the examination was, in our view, improperly admitted. But those things that disclosed the defendant's conduct, and indicated that he may have opposed the examination because of his fear of the result, were clearly admissible, as indicating defendant's state of mind. The court's improper comments were directed not against defendant but against his counsel. Under no view of the facts could this have wrought a miscarriage of justice with respect to the insanity issue.

Appellant has assigned as reversible error irregularity on the part of the jurors in their deliberation on this verdict. The grounds of this motion are that the two alternate jurors were permitted to remain in the jury room with the twelve regulars after the cause had been submitted to said jury. There is no merit in this contention. After the reading of the instructions the court concluded that the courtroom would be the most comfortable and convenient place for their deliberations and made an order to that effect. The two alternate jurors remained in the courtroom with the jurors a few minutes while the room was being put in order but no deliberations or discussion of the case was had in their presence. Sheriff Sharp and his attendant

in charge made affidavits which were not traversed showing beyond question that the matter assigned as error was without merit.

The defendant further urges as grounds for a new trial that judgment was not pronounced within the time and according to the provisions of sections 1191–1202, Penal Code. The jury returned its verdict of guilty on July 2, 1937, after a trial of six days. It returned its verdict that the defendant was sane, after a trial of eight days, on July 15th. Upon the return of its verdict on the issue of sanity the court set and fixed July 20th as the day for pronouncing judgment. On the same day, July 15th, counsel for the defendant made the request that at the expiration of said five days, which would occur on July 20th, that the defendant would and he did then request an additional ten days in which to file a motion for a new trial and prepare arguments in support of the motion. The court said it was his reading of the law that on the fifth day after the rendition of the verdict the court might extend the time for pronouncing judgment not more than ten additional days. He further was of the view, "that if, in the opinion of the court there is reasonable ground, upon the request of the defendant, such time may be extended not more than ninety days additional. Then, let it be understood that the time for pronouncing sentence will be fixed for the 20th of July, 1937, with the definite understanding that the record show that the hearing of the motion for a new trial be set for August 6th, 1937''.

"Mr. Wylie (District Attorney):

That will be satisfactory to us.

Mr. Howe (Attorney for defendant):

Let the record show that it is done by stipulation, by consent of both sides, with the approval of the court.

The Court: Very well; it is so ordered.''

The defendant in person requested the extension. The court here expressed as its view of the statute that the court must, upon the return of the verdict, fix the time for pronouncing judgment not less than two nor more than five days from the return of the verdict. But for the purpose of hearing any motion for a new trial the court may extend the time not more than twenty days where probation is

being considered. The court expressed the view that it is only upon the request of the defendant that the time may be extended. The defendant was asked again by the court if he requested that the time for pronouncing judgment and sentence be extended to August 6th and he replied that he did.

On July 20th the court met and announced that the time set for pronouncing judgment had arrived. Counsel for the defendant requested that in accordance with the stipulation and the request of the defendant and agreeable to the proceedings had in said matter as heretofore set forth, that the arguments on the motion for a new trial be set for August 6th. The court therefore fixed August 6th as the day for pronouncing judgment, sentence and hearing of the motion for a new trial.

No suggestions were made by the counsel for the defense during the proceedings to obtain an extension of time as to the proper construction of section 1191, Penal Code, with respect to the power of the court to grant extensions of time in cases where probation was or was not requested.

Upon the convening of court on August 6th, the court's announcement that the time had come for pronouncing judgment was met with motions to grant a new trial on the ground that the judgment had not been pronounced within the time prescribed by sections 1191 and 1202, Penal Code. Objection was made to the court considering the motion for a new trial on the ground that it had no jurisdiction to make any order. The defendant in person and all of counsel for the defense took part in the proceeding. The various objections were overruled and the motion on all grounds was denied. It is made clear from the proceedings had that counsel for the defendant took an active part in inducing the court to postpone judgment beyond a period which had enabled them to make the jurisdictional objection upon which they now rely in support of their motion for a new trial.

Section 1191, Penal Code, provides that the court must appoint a time for pronouncing judgment which must not be less than two nor more than five days after a verdict of guilty; provided, that the court may extend the time not more than ten days for the purpose of hearing or determining any motion for a new trial, or in arrest of judgment.

Section 1202, Penal Code, provides: "If no sufficient cause is alleged or appears to the court at the time fixed for pronouncing judgment, as provided in section 1191 of this code, why judgment should not be pronounced, it must thereupon be rendered; and if not rendered or pronounced within the time so fixed or to which it is continued under the provisions of section 1191 of this code, then the defendant shall be entitled to a new trial."

The time for pronouncing judgment was fixed, at the request of the defendant, on the last day within the time provided by statute, to wit, July 20th. On that day the defendant, *in propria persona*, and by stipulation of counsel, induced the court to extend the time for pronouncing judgment, to and as of August 6th, exceeding by five days (as counsel now insist) the jurisdictional period within which the court could have acted. The court granted the joint and several requests of defendant and his counsel. When the time for pronouncing judgment arrived the objection that judgment had not been pronounced within the time provided by statute was raised by counsel who had procured the extension.

It cannot be contended that the court *failed* or refused, as those terms are used in the statute (sec. 1202) to pronounce judgment but upon request of defendant and counsel extended the matter for defendant's benefit.

It is true that a few decisions of our appellate courts may be cited which held as a matter of right that the defendant was entitled to a new trial in cases wherein judgment was not pronounced within five days after a plea or verdict of guilty. But as said in *People* v. *Stroff*, 134 Cal. App. 670, 671 [26 Pac. (2d) 315], "These cases, however, by reason of later decisions hereafter referred to can no longer be considered as authority. All of the cases cited by appellant overlook the provisions of Section 4½ of Article VI of the constitution prohibiting the granting of a new trial for any error as to matter of procedure unless such error had led to a miscarriage of justice." The provisions of the statute were enacted for the express benefit of the defendant. Having expressly waived the benefits which the statutes conferred upon him he is concluded by his action. *People* v. *Manriquez*, 188 Cal. 602, 606 [206 Pac. 63, 20 A. L. R. 1441], is

decisive of the question. In *People* v. *Zuvela,* 191 Cal. 223 [215 Pac. 907], judgment of the court was not pronounced within the time prescribed by section 1191. It was contended that the defendant was entitled to a new trial as a matter of right. In answer to this contention, this court said: "We are satisfied that Section 4½ of Article VI of the constitution operates to prevent the granting of a new trial for the [procedural] error, if any, specified."

We have not been cited to a decision holding to the contrary where the above section of the Constitution was brought to the court's attention. Defendant suffered no possible prejudice by the extension of time and no miscarriage of justice resulted from the extension granted to him.

Appellant's counsel have in their briefs charged the trial judge with bias against the defendant and his counsel. On many occasions during the trial counsel requested the court to reprove counsel for the prosecution for misconduct, which motions were usually passed unnoticed or denied. It was difficult in many instances to judge as to which side was the most at fault. The outstanding instance occurred when the prosecution charged the leading counsel for the defense with indicating to Mrs. French by movements of his head when he wished a "no" or "yes" answer. Counsel indignantly denied the accusation and the incident no doubt was forgotten after the forensic speech of counsel came to an end. The jury was in a better position to have observed such conduct than the court, who may not have observed it, if it actually happened.

It cannot be presumed that juries are induced to decide matters of great moment on the indiscreet remarks of opposing counsel moved by partisan zeal. The alleged charge of bias on the part of the judge is without sound foundation. The charge is refuted by the following instruction of which there were a number given of similar import, specifically charging the jury that, "If the judge of this court has at any time during this trial, used any language that has seemed to indicate the opinion of the judge as to any question of fact, or as to the credibility of a witness, you must not be influenced thereby but you must determine for yourselves all questions of fact without regard for the opinion of any one else." Reading the entire charge if was full, fair, and

complete, and if it tended to favor either side, it was more favorable to the defendant than the law requires.

It should also be mentioned, that although both the Constitution and statute permit the trial judge to comment on the evidence, and on the failure of the defendant to take the stand, this privilege was not exercised in this case, but on the contrary the court specifically instructed the jury that they should give the testimony of the defendant that same careful consideration that it must give to any or all other witnesses in the case.

 The defendant earnestly urges this court to reduce the punishment from the imposition of the extreme penalty to life imprisonment. The court has no power where the defendant is convicted of murder of the first degree, in cases where the jury has exercised the discretion imposed in it, to substitute its discretion for that of the jury as to the extent of punishment to be imposed. In cases where the evidence shows that the homicide was committed with deliberation, premeditation and malice aforethought, the crime is murder of the first degree, with absolute power in the jury to determine the penalty. That there is evidence to sustain the jury's finding cannot be questioned. That being so this court is powerless to interfere with the exercise of the jury's discretion. The case was tried in the county in which the defendant resided from infancy. He was active in public, social, and business affairs. He was ably and skillfully defended. As a matter of law, we are unable to excuse or minimize his offense on any legal grounds. The plea to reduce the punishment to life imprisonment is in effect asking this court to exercise the commutation power which is exclusively a prerogative of the chief executive of the state.

The judgment and orders appealed from are, and each of them is, hereby affirmed.

Waste, C. J., and Curtis, J., concurred.

Edmonds, J., concurred in the judgment.

SHENK, J., Concurring.—I concur in the judgment. I see no escape from the conclusion that the homicide was murder of the first degree. I am convinced, however, that the defendant suffered provocation which would weigh

greatly in his favor if the court, in the exercise of its power under section 1181 of the Penal Code, could properly modify the judgment. The "judicial commutation" authorized by that section does not comprehend the power to reduce the penalty within the first degree, from death to life imprisonment. That function is exclusively with the jury in the first instance and then with the Governor in the exercise of his constitutional power of commutation.

Langdon, J., concurred.

HOUSER, J., Dissenting.—I dissent.

To my mind, it amounts to a denial of the application of the principle of "due process" to adjudicate in effect that, although the jury is required to fix the punishment that shall be imposed on an accused who has been found guilty of murder in the first degree, it must do so in utter ignorance of any facts which relate to the commission of the crime other than those which show "the circumstances connected with the offense".

Aside from generalities, in the instant case, the mental state of defendant at the time when the crime was committed was a most important element of his defense. Had he been even a normal individual, it is obvious that, during a period of several months that preceded the commission of the offense, the effect upon his mind of almost continuous insult, slander and libel, not only as it affected himself personally, but also the good reputation of his mother and his sisters, to say nothing of other relatives, must have been most provocative. The original adverse criticism of defendant which was made by the man who suffered death as the result of his temerity in that regard may not have been so harsh; but each subsequent similar attack carried with its own singular effect the certainty of increasing the sting of each and all of the former oral or printed castigations to which defendant theretofore had been subjected. In such circumstances, the final attack, although possibly not so severe as some of those which had preceded it, was like the "last straw on the back of the camel". The continuous insult and humiliation to which defendant had been subjected finally proved to be too great for his peculiar nature to further endure. As a matter of ordinary observation, and without regard to contrary judi-

cial precedent with reference thereto,—considering the trial of the issue of "not guilty by reason of insanity" and the facts which were therein developed, especially that defendant's mental makeup was that known as "introvert"—the materiality of all evidence that bore either directly or indirectly upon his state of mind at the time when the offense was committed should be most apparent.

By statutory provision, one of several conditions, which, if existing at the time when a homicide is committed, in law will justify the commission of the offense is where it has been induced or prompted by "heat of passion" (sec. 195, Pen. Code). In addition thereto, one of the definitions of the crime of manslaughter is that it is the unlawful killing of a human being, without malice, in the "heat of passion". Although the weight of judicial authority may not countenance the fact, nevertheless, from the viewpoint of the layman, it must be obvious that in especially irritating or provoking circumstances such a condition in the mind of an average man might have been created by reason of an indignity which he had suffered and which might result from any one or more of many causes; for example, a slur upon his integrity, an insinuation or a direct charge of unchastity of his mother or his sister, a spit in his face, or a tweak of his nose, or even a slap on his cheek. No words of statute require that either a "sudden quarrel", or a physical encounter of any sort, precede the act or acts which induce the "heat of passion". For aught that may be indicated therein, "heat of passion" may be engendered by any untoward act on the part of the person whose life is subsequently taken by the accused. To the lay mind, so-called "laws" to the contrary are subject to the criticism that they are purely "judge made"; and it is indisputable that they are singularly lacking in sanction by legislative act. Likewise is it manifest, notwithstanding judicial precedent to the contrary, that the mind of a "high strung", red-blooded man, who has been subjected to insult in any form is more likely to become aroused to a "heat of passion" than is that of a placid and phlegmatic individual. To an introvert, or one who broods upon his troubles (such as was the defendant herein), it is not improbable that in the course of time a single insult would or might be provocative of a "heat of passion"; but it approaches a certainty that a

long-continued course of oral or printed personal attack upon him inevitably would produce that result. Hence, on the "not guilty" issue, the importance to defendant of establishing the fact not only that on a limited number of occasions (regarding which evidence was admitted), he or some member of his family was subjected to vilification and abuse by the man whom he thereafter killed, but also that on dozens of other occasions, regarding which evidence was offered by defendant but which was denied admission by the trial court, the person who was killed continued in his oppressive and provoking course in that regard. In such circumstances, to my way of thinking, no limit should have been placed by the trial judge upon the introduction in evidence of newspaper articles which were prepared, published and circulated by the man whom defendant killed, which articles reflected upon defendant or his relatives in any way; and whether such evidence in its direct effect was great or trifling, or whatever its volume, or however numerous such newspaper articles may have been, was immaterial as far as the admissibility of such evidence was concerned. Also, I am convinced that it was receivable either as tending to mitigate the offense and thus become useful to defendant for the purpose of forming some substantial base upon which the jury properly might act on the question of fixing the punishment that should be imposed on defendant if found guilty of murder in the first degree, or in determining whether the crime of which he was guilty constituted that of manslaughter only.

On the theory that the "not guilty" issue defendant was entitled to establish the existence of "heat of passion" as a "defense", the case of *People* v. *Hurtado,* 63 Cal. 288, is instructive. In that case, in an attempt to legally justify the killing, the wife of the defendant testified "that she confessed to him prior to the killing, she had been guilty of adultery with deceased, and that the confession was followed by great anger, weeping, and mental depression on the part of defendant". The defendant was convicted; and on appeal from the ensuing judgment, he urged as prejudicial error on the part of the trial court its refusal to instruct the jury that: "If the jury believe from the evidence that the defendant was not so insane, at the time of the homicide, as to be irre-

sponsible for his acts, but at the time he was laboring under such a mental unsoundness as to cause him to be easily aroused to a sudden heat of passion, and that he committed the homicide without malice aforethought, but on a sudden heat of passion aroused and caused by an act of injustice towards him, committed by the deceased, it will be their duty to find him guilty of manslaughter only." In ruling that the instruction was properly refused, in part it was declared by this court that: *"To reduce the offense to manslaughter the provocation must at least be such as would stir the resentment of a reasonable man.*

"It cannot be urged that the homicide is manslaughter because it was committed in an *unreasonable* fit of passion. In an abstract sense anger is never reasonable, *but the law, in consideration of human weakness, makes the offense manslaughter when it is committed under the influence of passion caused by an insult or provocation sufficient to excite an irresistible passion in a reasonable person; one of ordinary self-control."* (Emphasis added.)

Likewise, in the case of *People* v. *Logan*, 175 Cal. 45 [164 Pac. 1121], after reviewing the law respecting the same question presented therein, the court said that: "These cases serve to illustrate that it is not alone the fear of great bodily injury which will reduce a homicide to the grade of manslaughter. *The passion aroused may be one entirely disconnected with any fear of personal injury, the fundamental inquiry being, we repeat, whether it be sufficient to obscure reason and render the average man liable to act rashly* (citing cases). . . . But upon this suffice it to say that, having in mind the facts as above outlined, the feelings naturally engendered in defendant's mind by the indignity previously put upon him, the physical superiority of the deceased, the aggressive manner in which he accosted him, the fear that he was about to be subjected to a second humiliating beating, *there was at least some evidence tending to reduce the crime from murder to manslaughter,* for the due consideration of which evidence defendant was of right *entitled that the jury should be correctly instructed.* For, as well said in *Stevenson* v. *United States*, 162 U. S. 313 [16 Sup. Ct. 839, 40 L. Ed. 980] . . . : 'The evidence might appear to the court to be simply overwhelming to show that the killing was in fact

murder and not manslaughter, or an act performed in self-defense, and yet, *so long as there was some evidence relevant to the issue of manslaughter, the credibility and force of such evidence must be for the jury, and cannot be matter of law for the decision of the court.'*" (Emphasis added.) As a *résumé*, the syllabus is a correct indication of the ruling. It is as follows: "In the present condition of our law *it is left to the jurors* to say whether or not *the facts and circumstances in evidence* are sufficient to lead them to believe that the defendant did, or to create a reasonable doubt in their minds as to whether or not he did, commit his offense *under a heat of passion;* and an instruction which defines the nature of the passion itself and *limits the exciting cause to a serious injury, or attempted injury, to the person of the defendant, is erroneous.*" (Emphasis added.)

The jury has but one opportunity to render its verdict on the "not guilty" issue; and, as far as the jury is concerned, that verdict is *final*. If, in accordance with the views expressed in the prevailing opinion herein, evidence of facts which may have constituted the inducing cause of "heat of passion" legally may be excluded from consideration by the jury, how is it possible for the jury to rightfully determine either the *kind* of crime that has been committed, or the *degree* thereof; or how may the jury justly solve the problem which involves the question of *what penalty* should be imposed on the defendant? Manifestly, an uninformed jury is not qualified to render justice.

Nor should reasons for my inability to agree with my associates in their conclusion herein be deemed limited by or confined to the foregoing observations. Several other reasons for my protest against the judgment herein might be pertinent, not only as applying to the points to which some attention has been devoted, but as well to others. (See dissenting opinion in *People* v. *Troche*, 206 Cal. 35, 51 [273 Pac. 767].) However, I cannot refrain from at least expressing the fact that I seriously doubt the correctness of the basic assumption which, at least by inference, appears in the concurring opinion, to wit, that in the premises the power or authority of this court either is or may be either increased or limited by the provisions of subdivision 6 of section 1181 of the Penal Code. Originally, the several provisions of the Constitution of this

state expressed all the powers that were possessed by this court. As far as I am aware, with the possible exception of powers that relate to findings of fact, which are conferred by the provisions of section 4¾ of article VI of the Constitution, the legislature of this state has no authority either to increase or to decrease in any way any of the powers of this court. If, either originally or by the provisions of any subsequent amendment to the Constitution, this court has been granted authority to modify the judgment in any particular, it still has it; and if jurisdiction has not been thus conferred, by no unauthorized legislative act could such a power be created in it. Besides, if the "penalty" be considered as a part of the judgment, and if legislative authority is all that is lacking in the matter of authority in this court to alter such penalty—although enacted prior to the date of the adoption of the present Constitution—section 1260 of the Penal Code is much broader in its scope, and in criminal appeals purports to authorize an appellate court to "reverse, affirm, or *modify* the judgment or order appealed from. . . . " (Emphasis added.)

Rehearing denied. Langdon, J., and Houser, J., voted for a rehearing.