Filed 8/22/16  P. v. Rowley CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MATTHEW ROWLEY et al.,<br><br>        Defendants and Appellants. | E063254<br><br>(Super.Ct.No. RIF1300594 & RIF1300626)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  David A. Gunn, Judge. Affirmed with directions.

Jennifer Peabody, under appointment by the Court of Appeal, for Defendant and Appellant, Matthew Rowley.

Marcia R. Clark, under appointment by the Court of Appeal, for Defendant and Appellant, Patrick Kohler.

1

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., and Anthony Da Silva, Deputy Attorneys General, for Plaintiff and Respondent.

On the evening of January 16, 2013, defendants Matthew Derrick Rowley and Patrick Aaron Kohler drove around Corona looking for Daniel Stordahl, a teenager Rowley had assaulted the previous night. When they found Stordahl, Rowley chased him on foot, cornered him against a wall and fired 11 shots from his Glock, killing Stordahl. Later that evening, defendants along with two other men broke into Antonius Spangler's residence and robbed him and his son at gunpoint.

The jury convicted both defendants of first degree murder, burglary, robbery, kidnapping, and false imprisonment. Rowley received a sentence of 28 years plus 50 years to life and Kohler 13 years plus 25 years to life. Defendants' sentences included consecutive terms for kidnapping and falsely imprisoning Antonius Spangler (counts 4, 6).

On appeal, Rowley contends there is insufficient evidence he premeditated and deliberated killing Stordahl, and Kohler contends there is insufficient evidence he aided and abetted first degree murder. Both defendants assert the court erred by failing to instruct the jury on voluntary manslaughter based on imperfect self-defense. They also argue the court violated Penal Code section 654 by imposing consecutive sentences for counts 4 and 6 because the kidnapping and false imprisonment were incidental to the

2

robbery.  Last, Kohler argues certain fees associated with his convictions should be reduced.

We agree the sentences for counts 4 and 6 must be stayed and Kohler's fees reduced, but otherwise we affirm the judgment.

I

FACTUAL BACKGROUND

A.    *The Murder of Daniel Stordahl*

Austin Smith, the prosecution's main witness, knew both Rowley and Kohler before the crimes that took place on January 15 and 16, 2013.[1]  In the later part of 2012, Smith met up with Rowley and Kohler five or six times to discuss ways to "help each other make more money" through robberies and drug sales.  Rowley and Kohler would arrive at the meetings in Kohler's mother's car, a black four-door Saturn, and Rowley would always carry a Glock handgun.

During the week prior to January 15, 2013, Smith communicated with Rowley almost daily about getting together to "make money."  Rowley told Smith he was looking for a person named David Crockett, who was dating Rowley's ex-girlfriend, Amanda.  Rowley "wanted to get Amanda away from him because he was a drug addict."  Smith did not know Crockett, but he knew Crockett's friend Aaron Spangler.

---

[1]  Smith entered into an agreement to plead guilty to robbery, with a term of nine years in prison, in exchange for his trial testimony.

Around 11:00 p.m. on January 15, 2013, Kohler drove Rowley, Smith, and Smith's friend Gabriel Archuletta to a hotel on Sixth Street in Corona where they thought they might find Crockett. Daniel Stordahl was standing in the parking lot in front of one of the rooms and Rowley got out of the Saturn and spoke with him briefly. When he returned to the Saturn, he told Kohler to look up Stordahl on his phone. Rowley yelled over to Stordahl and asked for his last name. Stordahl said he had already given Rowley his last name, to which Rowley replied, "I'll wash your mouth, and watch how you talk to me." Stordahl said, "I don't even . . . know you," and Rowley said, "That's exactly why I should wash your mouth." When Stordahl replied with "fuck you," Rowley went back over to Stordahl and started beating him up. Stordahl left his bicycle and ran away. Rowley's Glock remained in his waistband during the fight.

The group followed him in the Saturn. Rowley, who was sitting in the front passenger seat, said he wanted to "get" Stordahl. Smith, who was sitting in the backseat, noticed Rowley's Glock was now in his lap instead of his waistband. Kohler drove up and down Sixth Street for an hour looking for Stordahl, to no avail.

Around 10:00 p.m. the next night (January 16, 2013), Smith and his friend Dustin Munoz met up with Rowley and Kohler at a 7-Eleven parking lot in Norco. Rowley asked Smith if he remembered the "kid" from the night before and said, "I got him." Smith asked Rowley what he meant and Rowley said, "I shot him. I ran up on him and got him."

4

Rowley and Kohler proceeded to describe what had happened. Rowley said he and Kohler had gone back to the hotel from the previous night looking for Crockett, but instead had found Stordahl there again. When Stordahl noticed them he rode off on his bicycle. Kohler and Rowley followed in the Saturn but they lost him at some point and drove around looking for an hour before they found him again. When Stordahl ducked into an apartment complex on Border Avenue in Corona, Rowley jumped out of the car and ran after him.

Rowley chased Stordahl through the apartment complex until they reached a wall and Rowley was only "a couple of feet away" from him. As Stordahl "was trying to get over [the] wall," Rowley shot him. Stordahl screamed so Rowley shot him "like eight or nine more times." Rowley was laughing as he told Smith about the shooting; he thought the way Stordahl's body bounced when the bullets hit him was funny.

Kohler told Smith that when they found Stordahl again after having lost him "they got all excited again and chased him down." After Rowley ran out of the car, Kohler heard the gunshots. When Rowley came back, "they took off." As they talked about the shooting, Kohler listened to a police scanner on his phone. At one point he heard police say they were looking for a dark-colored car.

Later that night, Rowley brought up the shooting again. He told Smith he had to chase after Stordahl on foot because "they couldn't follow him through" the apartment complex in the Saturn. He said he shot Stordahl as he was trying to throw his bicycle over a wall. He could not recall how many times he had shot at him so he checked his

5

Glock in front of Smith. Smith testified there were 23 bullets remaining in the 33-round clip.

Several residents of the Border Avenue apartment complex heard Rowley shoot Stordahl. Sometime after 9:00 p.m., Jonathan Swart heard tires screeching and looked out his window to see a black car make a U-turn and park by a garage. A few minutes later he heard gunfire. Brenda Banuelos also heard gunfire and looked outside and saw a man running towards a black car stopped by a fire hydrant. The car's headlights were off but its taillights were on and the front passenger door was open. The man reached his left hand toward the back of his pants before getting in the car. The car drove off before the door closed.

Ray Salgado was woken up by the sound of male voices speaking loudly. Salgado heard at least five gunshots in rapid succession. He looked out his window and saw a man lying down on the sidewalk. He called the police and walked down and waited next to Stordahl, who looked to be in "pretty bad" condition.

When police arrived on the scene minutes later, Stordahl had no pulse. He was lying on his back next to a wall and a bicycle. There was a flat head screwdriver underneath the bicycle and bullet shell casings on the sidewalk. The police found no weapons on Stordahl. The wall next to his body bore blood spatter and six bullet strike marks. A forensic technician recovered 11 shell casings from the scene.

The coroner recovered five bullets from Stordahl's body during the autopsy and identified six gunshot wounds. Stordahl had one gunshot wound in the center of his

back, two on the back of his left shoulder, one on the back of his left arm, one in his armpit, and one on the left side of his body. Stordahl's face bore the marks of pseudo stippling, abrasions from shrapnel caused by a bullet hitting a nearby object such as a wall. Stordahl was 19 years old.

B.      *The Robbery of the Spangler Home*

After Rowley and Kohler described Stordahl's murder to Smith at the 7-Eleven parking lot, Smith agreed to show Rowley where Crockett's friend Aaron Spangler lived. Rowley wanted to rob the Spangler house and catch Crockett. He suspected Spangler's parents were not home and Crockett and Amanda would be there based on a photograph he had seen on Facebook. The group decided to "go in there and tie them up" and "if they had money . . . just go in there and get it."

Around 2:00 a.m., Rowley, Kohler, Smith, and Munoz drove to the Spangler's in Kohler's Saturn, armed with guns, masks, gloves, and zip ties. Rowley carried his Glock, Smith a .380-caliber pistol, Kohler a sawed-off 12-gauge shotgun, and Munoz a knife. They entered through an unlocked door in the back of the house and made their way to an upstairs bedroom. The room belonged to Antonius Spangler, a police sergeant, who was in bed asleep. Rowley shined his Glock's laser pointer on Antonius's chest.

Antonius testified he decided against reaching for the gun he kept on his nightstand when he realized a gun laser was pointed at his chest. One of the men threatened to shoot him if he did not get on the ground. He complied and the men bound his wrists and ankles with zip ties while one of them held a gun to the back of his head.

7

They placed a towel over his head and demanded $5,000.  They searched the bedroom and found his gun and badge in addition to jewelry, which they placed in a backpack.

Next, the men went to Antonius's son Aaron's room and tied him up.  Munoz stayed with Aaron while Rowley, Kohler, and Smith went back to Antonius's bedroom to see if he had any more guns.  Antonius kept a gun safe in his garage.  He gave them the correct numbers for the combination lock, but in the wrong sequence.

After several attempts at unlocking the safe, the men adjusted the ties on Antonius's ankles to give him enough room to shuffle.  They led him down to the gun safe and threatened to harm his children if he did not open it.  Antonius walked one of the men through opening the safe, then they took him back into the house and set him on the family room couch.  Rowley stayed with Antonius while Smith and Kohler placed the contents of the safe into duffle bags and backpacks.[2]

At 5:10 a.m. Antonius's alarm went off.  The men loaded up their car and left through the garage.  Antonius called for his daughter who came downstairs and cut the ties on his wrists.  Outside, Kohler could not find the keys to the Saturn so he and Rowley ran back inside to look for them.  Antonius yelled, "Get out of my house" and they fled.  Kohler found the keys in his pocket and they drove off, but not before Antonius was able to hobble to his front door and see they were driving a dark Saturn.

---

[2]  Antonius's safe contained 33 weapons, including handguns, rifles, ammunition, and smoke grenades.

Rowley left his Glock on a coffee table in Antonius's living room. A criminalist opined that the cartridges found near Stordahl's body matched the bullets test-fired from the Glock.

The Saturn was registered to a residence on Sutter Way in Riverside where Kohler and Rowley were living with Kohler's mother. Police searched the home and found 15 to 20 guns belonging to Antonius, along with various other items from the Spangler residence, a package of zip ties, gloves, and a mask. They also found 42 mason jars containing marijuana and lights used for growing marijuana in the garage. During the search, Rowley jumped out of a bathroom window and ran into the neighbor's yard.

Police recovered other items from the Spangler home at Smith's and Munoz's residences.[3]

C.     *The Defense*

The defendants did not testify or present any evidence. During closing argument, their counsel argued they should be found not guilty of all charges because Smith's testimony was untrustworthy. Kohler's counsel also argued Kohler had no idea Rowley intended to shoot Stordahl when he drove the getaway car and therefore was not an accomplice to the killing.

---

[3] Munoz pled guilty to robbery of an inhabited dwelling and received a nine-year sentence.

9

D.      *The Verdict*

The jury convicted both defendants of the first degree murder of Stordahl (Pen.

Code, § 187, subd. (a);**4** count 1), robbery of Antonius (§ 211; count 3), kidnapping

Antonius (§ 207, subd. (a); count 4), burglarizing the Spangler home (§ 459; count 5),

and false imprisonment of Antonius (§ 236; count 6) and his son Aaron (count 7).**5**

II

DISCUSSION

A.      *Rowley's First Degree Murder Conviction*

Rowley argues his first degree murder conviction should be reversed because there

is insufficient evidence he shot Stordahl after the requisite premeditation and

deliberation.  When reviewing a challenge to the sufficiency of the evidence, our inquiry

"is whether, on review of the entire record in the light most favorable to the judgment,

any rational trier of fact could have found the elements of the offense beyond a

reasonable doubt."  (*People v. Young* (2005) 34 Cal.4th 1149, 1180 (*Young*).)  "In

deciding the sufficiency of the evidence, a reviewing court resolves neither credibility

issues nor evidentiary conflicts.  [Citation.]  Resolution of conflicts and inconsistencies in

the testimony is the exclusive province of the trier of fact.  [Citation.]  Moreover, unless

the testimony is physically impossible or inherently improbable, testimony of a single

witness is sufficient to support a conviction.  [Citation.]."  (*Id.* at p. 1181.)

---

**4**  Undesignated statutory citations refer to the Penal Code.

**5**  Rowley was also convicted of misdemeanor assault of Stordahl (§ 240; count 2).

10

" 'A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. . . . "Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. [Citations.] "The process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.' " [Citations.]' " (*Young*, *supra*, 34 Cal.4th at p. 1182.)

In *People v. Anderson* (1968) 70 Cal.2d 15 (*Anderson*), the California Supreme Court developed guidelines "for the kind of evidence which is sufficient to sustain a finding of premeditation and deliberation." (*Id.* at p. 26.) Such evidence falls into three basic categories: (1) planning evidence—facts about what a defendant did prior to the killing which show he was engaged in activity directed toward killing; (2) motive evidence—facts about a defendant's prior relationship with the victim from which the jury could reasonably infer a motive to kill the victim; and (3) manner evidence—facts from which the jury could reasonably infer that "the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way." (*Anderson*, at pp. 26-27.) While helpful in assessing the state of the record, the *Anderson* categories are not required elements of premeditation and deliberation, nor must they "be present in some special combination or . . . be accorded a particular weight." (*People v. Sanchez* (1995)

11

12 Cal.4th 1, 33; 1 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Crimes Against The Person, § 122, p. 917; *People v. Perez* (1992) 2 Cal.4th 1117, 1125 [the categories are "descriptive, not normative"].)

On this record, we find strong evidence of premeditation and deliberation in the form of each of the three categories. As to manner of killing, Smith testified that Rowley said he chased Stordahl through an apartment complex, cornered him against a wall, shot him in the back as he attempted to throw his bicycle over the wall, then shot at him 10 more times. The evidence showed Rowley fired a total of 11 bullets at Stordahl, hitting him with at least five. This manner of killing indicates a preconceived decision to kill. As the California Supreme Court explained in *People v. Thomas* (1992) 2 Cal.4th 489, shooting a person at such close range constitutes "a method sufficiently ' "particular and exacting" ' to warrant an inference that defendant was acting according to a preconceived design." (*Id.* at p. 518; see also *People v. Morris* (1988) 46 Cal.3d 1, 23 (*Morris*) ["The fact that defendant shot the victim twice from close range could reasonably support an inference by the jury that the manner of killing was " 'particular and exacting' " "], disapproved on other grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 543, fn. 5.)

Regarding motive, the record discloses Rowley placed his Glock in his lap and exclaimed he wanted to "get" Stordahl after he insulted Rowley in the hotel parking lot in front of his group. Additionally, Rowley believed Stordahl to be a friend of Crockett, the man he was on a mission to separate from his ex-girlfriend. Based on this evidence, the jury could reasonably infer Rowley wanted to kill Stordahl as revenge for embarrassing

12

him in public or because Stordahl was associated with Crockett, or some mix of both. As to planning, the evidence that Rowley chased Stordahl through an apartment complex armed with a gun and that he escaped in a waiting car moments after the shooting is sufficient to support an inference he planned the shooting in advance. (See e.g., *Morris*, *supra*, 46 Cal.3d at p. 23 ["Defendant's possession of a weapon in advance of the killing, and his rapid escape to a waiting car moments afterwards, amply support an inference of planning activity"].)

Rowley contends the manner in which he shot Stordahl demonstrates his decision to kill was "rash and impulsive," not preconceived. He claims the 11 shots he fired at close range demonstrates "only . . . intent to kill, not premeditation and deliberation." This argument ignores the long line of cases holding that close range, execution-style shooting is such strong evidence of premeditation and deliberation that it is sufficient *by itself* to support a conviction for first degree murder.

As we explained in *People v. Boatman* (2013) 221 Cal.App.4th 1253, courts have found sufficient evidence of premeditation and deliberation in the absence of planning or motive evidence where " '[t]he manner of the killing clearly suggests an execution-style murder.' " (*Id.* at p. 1269, citing *People v. Hawkins* (1995) 10 Cal.4th 920, 956 (*Hawkins*), overruled on other grounds in *People v. Lasko* (2000) 23 Cal.4th 101, 110; see also *People v. Bloyd* (1987) 43 Cal.3d 333, 348 (*Bloyd*).) In *Hawkins*, the victim was found in a ditch in an open field with one gunshot wound in the back of the neck and one in the back of the head. (*Hawkins*, *supra*, at p. 956.) The court concluded: "[A]lthough

13

evidence of planning and motive was indeed minimal if not totally absent in the present case, we conclude that the manner-of-killing evidence was sufficiently strong to permit a trier of fact to conclude beyond a reasonable doubt that defendant committed the . . . murder with premeditation and deliberation." (*Id.* at p. 957.) In *Bloyd*, the court found the manner in which the victims were killed—both died from "pointblank" gunshot wounds to the head—"was very strong evidence of deliberation and premeditation." (*Bloyd*, *supra*, at p. 348.) In *People v. Mayfield* (1997) 14 Cal.4th 668, where defendant wrested a gun from and shot an officer during a brief altercation, the court held the jury could reasonably conclude that "before shooting [the officer] defendant had made a cold and calculated decision to take [his] life after weighing considerations for and against." (*Id.* at p. 767, abrogated on a different ground in *People v. Scott* (2015) 61 Cal.4th 363, 391.) As for Rowley's characterization of the shooting as "rash and impulsive," it has long been acknowledged that "[t]he act of killing may follow the intent to kill as rapidly as follow the successive thoughts of the mind," or, as rapidly as aiming a gun and pulling a trigger. (*People v. French* (1939) 12 Cal.2d 720, 745.)

Rowley makes much of Smith's testimony that it did not make sense to kill Stordahl as a means of keeping the search for Crockett secret because Smith believed Crockett already knew Rowley was looking for him. Even if we assume it was illogical for Rowley to kill Stordahl, "the law does not require that a first degree murderer have a 'rational' motive for killing. Anger at the way the victim talked to him [citation] or any motive, 'shallow and distorted but, to the perpetrator, genuine' may be sufficient

14

[citation]." (*People v. Lunafelix* (1985) 168 Cal.App.3d 97, 102.) As explained, the jury could reasonably infer Rowley's motive to kill was simply that Stordahl had addressed him with disrespect in public. In any event, evidence of a motive is not required for a first degree murder conviction. "We have never required the prosecution to prove a specific motive before affirming a judgment, even one of first degree murder. A senseless, random, but premeditated, killing supports a verdict of first degree murder." (*People v. Thomas*, *supra*, 2 Cal.4th at p. 519.)

We find ample support for a first degree murder conviction in the evidence that, after becoming enraged at Stordahl the previous night, Rowley chased him down and shot at him 11 times at close range.

B.      *Involuntary Manslaughter/Imperfect Self-defense*

Defendants argue the court erred by failing to instruct the jury on voluntary manslaughter as a lesser included offense of the first degree murder charge against Rowley. They argue substantial evidence supports the theory that Rowley shot Stordahl in self-defense when Stordahl came after him with a screwdriver. We find this characterization of the record untenable.

Voluntary manslaughter is a lesser included offense of murder and can be committed when one acts in what is known as imperfect self-defense. (*People v. Gutierrez* (2003) 112 Cal.App.4th 704, 708.) " 'Imperfect self-defense is the killing of another human being under the actual but unreasonable belief that the killer was in imminent danger of death or great bodily injury.' " (*People v. Rodarte* (2014) 223

15

Cal.App.4th 1158, 1168.)  A trial court has a duty to instruct on a lesser included offense when there is " 'substantial evidence' " from which a " 'reasonable' " jury " 'could . . . conclude' " the defendant committed the lesser offense rather than the offense charged. (*People v. Breverman* (1998) 19 Cal.4th 142, 162.)  Substantial evidence does not mean minimal or speculative evidence.  (*Ibid.* [substantial evidence is not " '*any* evidence, no matter how weak' "].)  To invoke the court's duty to instruct, the evidence must be " 'substantial enough to merit consideration' by the jury." (*People v. Moye* (2009) 47 Cal.4th 537, 553.)

Nothing in the record supports the theory Rowley feared Stordahl would inflict grave bodily injury upon him with a screwdriver.  The evidence instead portrays Stordahl as the fleeing target of Rowley's relentless pursuit.  Two nights in a row defendants pursued Stordahl through the streets of Corona until Rowley finally trapped him against a wall.  The autopsy revealed Stordahl suffered multiple gunshot wounds, including one to the center of his back.  This evidence corroborates Smith's testimony that Rowley's initial shot hit Stordahl as he was trying to throw his bicycle over the wall.  Simply put, Rowley pursued Stordahl over the course of two days then shot him in one of the most vulnerable positions in which a person can find himself—cornered and with his back turned to his assailant.

Contrary to defendants' contention, the existence of a screwdriver at the murder scene and Salgado's testimony he heard loud voices right before the gunshots do not support a finding that the men argued and Stordahl brandished a weapon before Rowley

16

opened fire. The police found a screwdriver at the scene of the murder but there was no evidence it belonged to Stordahl or that Stordahl ever wielded it against Rowley. In fact, the evidence precludes such a finding. There was no opportunity for Stordahl to attempt to defend himself because Rowley shot him as he was trying to throw his bicycle over the wall. As for the voices, Salgado said only that he heard loud voices and figured his "neighbors [were] having a small gathering in their patio"; he never described what he heard as an argument. Defendants' theory of self-defense is based on a speculative extrapolation of two minor points of testimony in an eight-day trial transcript. (*People v. Wilson* (1992) 3 Cal.4th 926, 941 ["Speculation is an insufficient basis upon which to require the giving of an instruction on a lesser offense"].) On this record, the court had no duty to give a voluntary manslaughter instruction.

C.    *Kohler's First Degree Murder Conviction*

Kohler argues his conviction for first degree murder under a direct aiding and abetting theory must be reversed because there is insufficient evidence he knew Rowley intended to kill Stordahl before he helped Rowley chase him down. He asserts the evidence shows, at most, that he believed Rowley wanted to continue fighting him. We disagree.

Aiding and abetting the commission of a crime renders one a principal in the crime. (*People v. McCoy* (2001) 25 Cal.4th 1111, 1116-1117; § 31.) "[A] person aids and abets the commission of a crime when he or she, acting with (1) knowledge of the unlawful purpose of the perpetrator; and [with] (2) the intent or purpose of committing,

17

encouraging, or facilitating the commission of the offense, (3) by act or advice aids, promotes, encourages or instigates, the commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 561.)

" '[O]utside of the natural and probable consequences doctrine, an aider and abettor's mental state must be at least that required of the direct perpetrator,' and when the crime is murder, the 'aider and abettor must know and share the murderous intent of the actual perpetrator.' [Citation.] '[A]n aider and abettor will 'share' the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime.' " (*People v. Maciel* (2013) 57 Cal.4th 482, 518; see also *People v. Chiu* (2014) 59 Cal.4th 155, 166-167.)

Kohler played the role of the getaway car driver, and while he did not exit the Saturn with Rowley and thus was not present for the shooting, there can be no dispute his act of driving Rowley to and from the scene constitutes sufficient evidence of the second and third elements of accomplice liability—intentionally committing an act to aid and promote the direct perpetrator's criminal efforts. The question this case raises is what precise criminal effort did Kohler intend to assist. Put another way, did Kohler have the requisite knowledge that Rowley intended to murder Stordahl?

An accomplice's knowledge of the perpetrator's criminal purpose must exist at the time the accomplice acts to facilitate or encourage the crime. (*People v. Williams* (1997) 16 Cal.4th 635, 676.) To be guilty as an accomplice to first degree murder, one must

" 'know[] the full extent of the perpetrator's criminal purpose.' " (*People v. Prettyman* (1996) 14 Cal.4th 248, 259.) Once the evidence demonstrates *knowledge* of the perpetrator's intent *to kill*, the accomplice's premeditation may be reasonably inferred, as "[i]t would be virtually impossible for a person to know of another's intent to murder and decide to aid in accomplishing the crime without at least a brief period of deliberation and premeditation, which is all that is required." (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1166.) Thus, given the clear evidence of Kohler's assistance in the crime, we must uphold his conviction if there is substantial evidence to support a finding he provided that assistance with full awareness of Rowley's murderous purpose.

Accepting Smith's testimony as we must under a substantial evidence review, we conclude his description of the events of January 15 and 16 supplies the necessary evidentiary support to uphold the conviction. According to Smith, Kohler witnessed the altercation in the hotel parking lot and saw how angry Rowley became when Stordahl talked back to Rowley. Kohler also knew his friend believed Stordahl was associated with Crockett. Aware of these circumstances, Kohler helped Rowley pursue Stordahl in an effort to continue the altercation.

What occurred during this pursuit is crucial for the jury's understanding of Kohler's accomplice liability. Smith, who was in the backseat of the Saturn at the time, testified that Rowley had taken his Glock from his waistband and set it on his lap. Smith also heard Rowley exclaim he wanted to "get" Stordahl.

19

From this testimony, the jury could infer Kohler, who was sitting closer to Rowley than Smith was, saw and heard the same things.  The jury could further infer Kohler understood the word "get" to mean "shoot" or "kill."  Such an inference would be reasonable, given that Rowley had a gun on his lap at the time.  In fact, Rowley used the very same phrasing the next night when he described the shooting to Smith, using the words "got" and "shot" interchangeably.  Rowley bragged, "I shot him.  I ran up on him and got him."  Based on this evidence, the jury could infer this was how Rowley spoke, and that, as his friend, Kohler understood what Rowley meant when he used the terminology of *getting* someone.[6]

On appeal, Kohler points to the evidence that could support an inference he believed Rowley intended only to fight Stordahl.  He argues the fact Rowley was armed was no reason for him to suspect a murderous intent because Rowley was always armed.  He points out that if Rowley had planned to shoot Stordahl he could have done so when he was an easy target in the hotel parking lot.  He also points out that Smith testified it did not make sense that Rowley killed Stordahl because Crockett already knew Rowley was looking for him.  In relying on this evidence Kohler misunderstands our task on appeal, which is not to identify the evidence that conflicts with the jury's verdict, but rather to assure ourselves there is substantial evidence to support the verdict.  The jury's

---

[6] Kohler relies heavily on Smith's testimony that he (Smith) figured "get" meant finish the fight.  Even if we entirely ignore Rowley's statement, assuming it was too ambiguous or Kohler did not hear it, the sheer fact Rowley pulled his gun from his waistband to his lap as Kohler pursued Stordahl is sufficient evidence to support an inference that Kohler knew his friend planned to shoot Stordahl if they found him.

verdict " 'may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.' " (*People v. Brown* (2014) 59 Cal.4th 86, 106.) We may reverse for insufficient evidence only when there is " 'no hypothesis whatever' " to support the jury's verdict. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.) By citing the evidence that would support his theory he was ignorant of Rowley's intent, Kohler ignores the crucial fact that Rowley was not just *armed* with a gun during the initial pursuit of Stordahl, but had taken that gun out of his waistband (where Smith testified he usually kept it) and placed it on his lap. This is substantial evidence to support an inference that Kohler knew Rowley would use that gun when they caught up with Stordahl.

Kohler's reliance on *People v. Loza* (2012) 207 Cal.App.4th 332 (*Loza*) does not help his argument. In *Loza*, a husband and wife were tried for the first degree murder of their landlord's boyfriend. The husband was convicted as the perpetrator and the wife as a direct accomplice. At trial, the prosecution presented evidence that when a neighbor thought she heard fighting noises and cries for help coming from the landlord's yard, "a short woman" standing in the yard told her the victim was just "shooting at squirrels." (*Id.* at p. 338.) The appellate court concluded this evidence was sufficient to support a finding the wife knew of her husband's plan to kill the victim. The jury could infer the "short woman" who talked to the neighbor was the wife and "could have believed that [the wife] knew that [the husband] planned to kill [the victim], and that she was helping cover up the murder by lying to the neighbor." (*Id.* at p. 361.)

21

Contrary to Kohler's contention, the evidence of knowledge of the direct perpetrator's intent is stronger in this case than it was in *Loza*. Unlike in this case, there was no evidence in *Loza* that the wife knew her husband intended to murder the victim before the fact. All we know is that the wife helped her husband cover up the murder as it was taking place. Here, in contrast, while Kohler did indeed assist Rowley in covering up the crime (he heard the gunshots, waited with the car running and the passenger door open, and then drove Rowley away from the scene) there is also evidence he knew of Rowley's plan well in advance of the shooting, when Rowley brandished his gun as they pursued Stordahl the night before. The record contains substantial evidence to support a finding that Kohler knew his friend intended to shoot Stordahl when he provided his assistance as the getaway driver.

D.    *The Kidnapping and False Imprisonment Sentences*

At sentencing, counsel for both defendants objected to the imposition of sentences for kidnapping and falsely imprisoning Antonius (counts 4, 6), arguing those crimes were committed to facilitate the theft of Antonius's property from the Spangler residence (the count 3 robbery).  The trial court overruled the objection, finding there were "separate acts, separate victims" and that the kidnapping was an "unnecessary addition to the robbery itself."  On appeal, defendants argue section 654 bars multiple punishments for the robbery, kidnapping, and false imprisonment of Antonius (counts 3, 4, 6).[7]  We agree.

Section 654 states that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."  The California Supreme Court has interpreted this language to bar multiple punishments for separate offenses arising out of a single occurrence "where all of the offenses were incident to one objective."  (*People v. Lewis* (2008) 43 Cal.4th 415, 519, citing *Neal v. State of California* (1960) 55 Cal.2d 11, 19.)  "[I]f all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, defendant may be found to have harbored a single intent and therefore may be punished only once."  (*People v. Harrison* (1989) 48 Cal.3d 321, 335.)  In the context of a robbery, a defendant who kidnaps or imprisons a victim in order to

---

[7]  Defendants concede the false imprisonment of Aaron (count 7) was correctly imposed because it involved a different victim than counts 3, 4, and 6.

facilitate stealing his or her property may not be punished for both crimes. (See, e.g., *People v. Beamon* (1973) 8 Cal.3d 625, 639; *People v. Thomas* (1994) 26 Cal.App.4th 1328 (*Thomas*); *People v. Lewis*, *supra*, at p. 519)

Such is the case here. Defendants kidnapped and imprisoned Antonius for the sole purpose of robbing him. During closing, the prosecution argued defendants committed the robbery when they stole Antonius's property by means of force or fear, the kidnapping when they moved Antonius from his bedroom to the garage to open the gun safe, and the false imprisonment when they ordered him out of bed and bound him with zip ties. According to Antonius's testimony, after defendants bound him they rummaged through his room and took his gun, badge, and some jewelry. He testified that defendants adjusted the binding on his ankles and took him downstairs to his garage with orders to open the gun safe. As the prosecutor's argument and Antonius's testimony make clear, defendants bound and moved Antonius for the sole purpose of stealing his weapons and other valuable belongings.

The People argue section 654 does not apply because defendants harbored more than one criminal objective. They argue the false imprisonment facilitated the theft of "jewelry and other items from [Antonius's] upstairs bedroom," while the kidnapping facilitated the theft of guns from the garage. The single objective test does not parse objectives this finely. The robbery of Antonius's home was a continuous criminal event that involved the theft of anything of value defendants could find. Faced with a similar argument by the People, the court explained in *Thomas*, *supra*, 26 Cal.App.4th 1328:

24

"[A]lthough appellant's plan for obtaining money from [the victim] may have changed in approach during the course of the kidnapping . . . there was only one continuous kidnapping. . . . That appellant may have changed his approach or focus as to the robbery, uttered a variety of threats to the victim, and engaged in other crimes after the initial abduction did not transform the offense into two kidnappings." (*Id.* at pp. 1334-1335.) Similarly, the robbery of Antonius's house was one continuous event. The fact defendants stole jewelry from one part of the house and guns from another does not transform the offense into two robberies with separate criminal objectives. As such, defendants' sentences for counts 4 and 6 must be stayed. (See *People v. Milan* (1973) 9 Cal.3d 185, 197 [the less severe sentences must be stayed while the most severe is imposed].)

E.       *Fees Imposed on Kohler*

At Kohler's sentencing, the trial court imposed $210 in conviction assessment fees and $280 in court security fees. By statute, the court security fee is set at $40 per conviction (Pen. Code, § 1465.8, subd. (a)) and the conviction assessment fee is set at $30 per conviction (Govt. Code, § 70373, subd. (a)(1)). With a total of six convictions, Kohler's court security fee should have been $240 and his conviction assessment fee should have been $180. (See *People v. Mitchell* (2001) 26 Cal.4th 181, 186-187 [reviewing court may correct clerical errors on appeal].)

III

DISPOSITION

Rowley and Kohler's judgments are modified to stay execution of the sentences on counts 4 (kidnapping of Antonius) and 6 (false imprisonment of Antonius), with the stay to become permanent on completion of service of sentence on count 3 (robbery). Kohler's court security fee is reduced to $240 and his conviction assessment fee is reduced to $180. In all other respects the judgment is affirmed. The superior court is ordered to prepare an amended abstract of judgment as set forth in this opinion and to forward a copy to the Department of Corrections and Rehabilitation.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


SLOUGH_____
                                        J.

We concur:


McKINSTER_____
          Acting P. J.


MILLER_____
              J.

26